**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROSEMARIE C. ABRIL,
<u>Plaintiff-Appellant,</u>

and

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO; VIRGINIA ALLIANCE OF                                   No. 97-1072
STATE EMPLOYEES, et al.,
<u>Plaintiffs,</u>

v.

COMMONWEALTH OF VIRGINIA,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
Samuel G. Wilson, Chief District Judge.
(CA-94-97-A, CA-94-153-A, CA-94-165-A, CA-95-5-A,
CA-95-6-A, CA-95-7-A, CA-95-8-A, CA-95-26-A,
CA-95-57-A, CA-95-58-A, CA-95-59-A, CA-95-60-A,
CA-95-98-A, CA-95-138-A, CA-95-209-A, CA-96-9-A,
CA-96-10-A, CA-96-11-A, CA-96-13-A, CA-96-111-A,
CA-95-27-A)

Argued: July 17, 1997

Decided: May 21, 1998

Before MURNAGHAN, Circuit Judge, and BUTZNER and
PHILLIPS, Senior Circuit Judges.

_____

Affirmed by published opinion. Senior Judge Phillips wrote the majority opinion, in which Judge Murnaghan joined. Senior Judge Butzner wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** John Bertram Mann, LEVIT & MANN, Richmond, Virginia, for Appellant. George Walerian Chabalewski, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee. **ON BRIEF:** James S. Gilmore, III, Attorney General of Virginia, Catherine C. Hammond, Deputy Attorney General, Neil A. McPhie, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

The question is whether the Eleventh Amendment provides immunity to suit for the Commonwealth of Virginia ("the Commonwealth") in actions filed against it in federal court by state employees seeking to recover damages for wage and overtime violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, as amended. The district court, rejecting contentions that the Commonwealth's immunity had been constitutionally abrogated by Congress under enforcement powers conferred by Section 5 of the Fourteenth Amendment or, alternatively, had been waived by the Commonwealth, dismissed the action for lack of subject matter jurisdiction. We affirm.

I.

Employees of twenty-one Virginia state prison and mental health facilities[1] filed separate actions against the Commonwealth in the United States District Courts for the Eastern and Western Districts of

_____

[1] The facilities are identified in the district court's opinion. See 949 F. Supp. 438, 440 n.2 (W.D. Va. 1996).

2

Virginia, alleging violations of the FLSA in various respects affecting their compensation as state employees.**2** On July 10, 1995, the district court denied the Commonwealth's motion to dismiss the then-consolidated actions on Eleventh Amendment jurisdictional grounds, holding that under <u>Pennsylvania v. Union Gas Co.</u>, 491 U.S. 1 (1989), Congress had the power under the Commerce Clause unilaterally to abrogate the states' Eleventh Amendment immunity to federal FLSA actions and had unequivocally done so by its 1974 amendments to that Act. <u>See</u> 949 F. Supp. 438, 440 (W.D. Va. 1996) (reciting procedural history).

Following an unsuccessful effort by the Commonwealth to obtain interlocutory review of that decision, and while the consolidated actions were pending disposition in the district court, the Supreme Court overruled <u>Union Gas</u>, holding in <u>Seminole Tribe of Florida v. Florida</u>, 116 S. Ct. 1114 (1996), that Congress did not have power under Article I of the Constitution unilaterally to abrogate the Eleventh Amendment immunity of nonconsenting states to suits in federal court for the recovery of monetary relief.

The district court then directed the parties to re-brief the issue of Eleventh Amendment immunity in light of <u>Seminole Tribe</u>. Responding, the Commonwealth moved, with supporting briefs, for reconsideration of its motion to dismiss, relying on <u>Seminole Tribe</u> as dispositive of the issue in its favor. The employees, resisting the Commonwealth's motion, contended that Congress's express abrogation of the states' Eleventh Amendment immunity was yet constitutionally valid as an exercise of its enforcement powers under Section 5 of the Fourteenth Amendment. Alternatively, they contended that, in any event, the Commonwealth had waived its immunity by participating in federal regulated activity. And finally, contending that the Commonwealth may have waived its immunity by participating in federal programs that require contractual waivers, they moved for leave to conduct limited discovery respecting that possibility.

_____

**2** Over the course of the litigation, all of the actions were ultimately consolidated for determination by the United States District Court for the Western District of Virginia, and were determined by that court's final order dismissing on the same grounds all the actions.

3

Following a hearing on the parties' cross-motions, the district court ruled in the Commonwealth's favor on each point, holding that Congress' attempted abrogation of the Commonwealth's Eleventh Amendment immunity to FLSA claims for monetary relief was not authorized as an exercise of enforcement powers conferred by Section 5 of the Fourteenth Amendment; that the Commonwealth had not, as a matter of law, waived its immunity by participating in federal regulated activity; and, as a matter of the court's discretion, that discovery as to possible contractual waivers would not be allowed. Accordingly, the district court dismissed the actions for lack of subject matter jurisdiction.

This appeal followed. On it, the employees challenge each of the district court rulings above identified. We take them in turn.

II.

We first consider whether, as the district court held, Congress's attempted abrogation of the states' (hence here the Commonwealth's) Eleventh Amendment immunity to private FLSA damage suits was unconstitutional. Conceding that under Seminole Tribe abrogation could not be upheld as an exercise of Article I Commerce Clause powers (the source expressly invoked by Congress), the employees contend that the requisite power can be found in the enforcement provision, Section 5, of the Fourteenth Amendment. **3** Specifically, the contention is that abrogation was effective as an exercise of Section 5 power because it served to enforce two rights protected by the Fourteenth Amendment: (1) primarily, the Equal Protection Clause right not to be subjected to invidious discrimination by a state's unequal treatment of comparably situated classes of persons, here that of private-sector and public-sector employees resulting from Eleventh Amendment immunity, and (2) an alleged First Amendment right of access to the courts as incorporated in the Fourteenth Amendment. See Appellants' Brief pp. 15, 16.**4**

_____

**3** Pursuant to U.S. Const. amend. XIV, § 5, "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

**4** Judge Butzner in dissent would rest decision on yet another abrogation theory: that the attempted abrogation may be upheld as an exercise

4

Because we think that the employees' "right of access" contention is essentially subsumed in their equal protection contention (the only unequal treatment relied upon being that respecting access to the federal forum), we consider the abrogation issue as confined to that created by the employees' equal protection contention. As so confined,**5**

_____

of Section 5 power to enforce the Privileges and Immunities Clause. The theory is interesting, but under the most fundamental principles constraining our appellate review function it simply is not before us. It has not been advanced or even adverted to by any party at any level--by pleading, motion, briefing, oral argument or otherwise. It is therefore not only a "new" issue in this litigation, it would appear to be a "novel" one in general Section 5 abrogation jurisprudence. While we have considerable discretion in "the matter of what questions may be taken up and resolved for the first time on appeal," Singleton v. Wolff, 428 U.S. 106, 121 (1975), that discretion is not unbounded. And, one of its surest boundaries is that imposed by requirements of fairness to affected litigants. Here, it would be patently unjust to decide this appeal against the Commonwealth on the basis of an issue--particularly one this novel--on which it has had no opportunity to be heard. See id. Accordingly, we may not properly consider it as a matter of discretion.

**5** Aside from the point that the"right of access" contention is effectively subsumed within the broader equal protection contention, we have grave doubts that there is any free-standing Fourteenth Amendment "right of access" specifically to a federal forum to be enforced under Section 5. We know of no Supreme Court decision recognizing any such specific access right--under the First Amendment, due process, equal protection or otherwise. And, while we do not either know of any decisions specifically denying the existence of such a right, there are powerful intimations to that effect. See, e.g., Younger v. Harris, 401 U.S. 37 (1971) (effectively denying, on federalism grounds, the right to a lower federal court forum to enjoin on federal constitutional grounds ongoing state criminal proceedings); Michael J. Wells & Edward J. Larson, Original Intent and Article III, 70 Tul. L. Rev. 75, 89 (1995) (arguing that Supreme Court limitations on federal habeas review have been based upon principle that "there is no constitutional right of access to a federal forum").

Two district courts considering the contention that abrogation in this situation could involve enforcement of such a free-standing Fourteenth Amendment right of access have rejected it on the basis that any denial of such a right of access was not by any positive state action but solely

5

we review it de novo. See Harter v. Vernon, 101 F.3d 334, 336-37 (4th Cir. 1996). Though it is one of first impression in this court, four of our sister circuits have addressed it and each has held, rejecting comparable state-employee contentions, that the attempted abrogation cannot be upheld as an exercise of Section 5 power to enforce Equal Protection Clause rights. See Mills v. Maine, 118 F.3d 37, 43-49 (1st Cir. 1997); Raper v. Iowa, 115 F.3d 623, 624 (8th Cir. 1997); Aaron v. Kansas, 115 F.3d 813, 817 (10th Cir. 1997); Wilson-Jones v. Caviness, 99 F.3d 203, 206-11 (6th Cir. 1997), amended on other grounds by 107 F.3d 358 (6th Cir. 1997); see also Powell v. Florida, 132 F.3d 677, 678 (11th Cir. 1998) (per curiam) (semble).[6] We now join those circuits in so holding.

Between them, these other courts of appeal have thoroughly canvassed the issue and come to the same conclusion, though by varying depths of analysis and by somewhat different reasoning at a few points.[7] Because we agree with their common conclusion and with the essentials of their common reasoning to it, we need not attempt a wholesale re-invention of the wheel and will simply summarize the salient points of their common reasoning with which we agree, expanding somewhat at the end-stage of the analysis.

_____

by force of the Eleventh Amendment. See Taylor v. Commonwealth, 951 F. Supp. 591, 600 (E.D. Va. 1996); Raper v. Iowa, 940 F. Supp. 1421, 1426 (S.D. Iowa 1966), aff'd on other grounds , 115 F.3d 623 (8th Cir. 1997). The Commonwealth relies on that theory and those decisions in opposing the employee's Section 5 argument. See Appellee's Brief, pp. 11-12. Because we think the contention may be rejected on the more fundamental and less problematic grounds above noted, we avoid addressing it.

[6] The United States District Court for the Eastern District of Virginia has also rejected a claim of abrogation under Section 5 enforcement power. See Taylor, 951 F. Supp. at 597-600.

[7] The most in-depth analyses are those of the First Circuit in Mills and, earlier, of the Sixth Circuit in Wilson-Jones . The intervening decisions of the Eighth Circuit in Raper and the Tenth Circuit in Aaron essentially adopted without independent analysis the critical final stage conclusion by the Sixth Circuit in Wilson-Jones that abrogation could not be upheld as an "appropriate" enforcement enactment under Section 5. See Raper, 115 F.3d at 624; Aaron, 115 F.3d at 817.

The determination whether in enacting the 1974 amendments to the FLSA Congress validly abrogated the states' Eleventh Amendment immunity to private FLSA suits in federal court turns on two questions: "whether Congress has `unequivocally expresse[d] its intent to abrogate the immunity'" and "whether Congress has acted `pursuant to a valid exercise of power.'" Seminole Tribe, 116 S. Ct. at 1123 (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)).

The 1974 amendments to the FLSA contain the required unequivocal expression of Congress's intent to abrogate that immunity. See 29 U.S.C. § 203(d) ("Employer" defined to "include[ ] a public agency"); § 203 (e)(2),(C) ("individual employed by a public agency" defined to mean "employed by a State"); § 216(b) ("action [for FLSA violation] . . . may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction . . ."); Mills, 118 F.3d at 42 (citing other decisions so holding).

Although in enacting the 1974 abrogation amendments Congress expressly invoked only the same Commerce Clause powers it invoked to enact the original and amending substantive FLSA provisions, that, standing alone, does not preclude a judicial determination that the attempted abrogation was effective as an exercise of Section 5 power. It is settled that abrogation may, in appropriate circumstances, be effected under the Section 5 power. See Fitzpatrick v. Bitzer, 427 U.S. 445, 453-56 (1976). And, under general principles of constitutional adjudication, such abrogation does not require that a specific provision be invoked as the source of congressional power. See Woods v. Cloyd W. Miller Co., 333 U.S. 138, 144 (1948) ("The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."); Usery v. Charleston County Sch. Dist., 558 F.2d 1169, 1171 (4th Cir. 1977) (question identified as "whether Congress had the authority to adopt the legislation, not whether it correctly guessed the source of that power") (citation omitted).

Whether an attempted abrogation may be upheld under Congress's Section 5 enforcement powers--expressly invoked or not--is determined under the general "appropriate means" test first laid down to define the reach of the Necessary and Proper Clause, Art. 1, § 8, cl.

7

18, in M'Culloch v. Maryland, 17 U.S. (4 Wheat) 316, 421 (1819),**8** as later specifically applied to the reach of the enforcement provisions of the Reconstruction Amendments in Ex parte Virginia, 100 U.S. 339, 345-46 (1879),**9** of the Fifteenth Amendment in South Carolina v. Katzenbach, 383 U.S. 301, 324 & 326 (1966), and even more specifically to the reach of Section 5 as a means of enforcing equal protection rights in Katzenbach v. Morgan, 384 U.S. 641, 650-51 (1966).**10** Though the test has always been ascribed over this course of applications to its origins in M'Culloch, its exact formulation has varied over time. In its most recent and specifically relevant formulation for application to the abrogation issue before us, the test was expressed in Morgan as being whether the enactment in question (1) "may be regarded as an enactment to enforce the Equal Protection Clause"; (2) "is `plainly adapted to that end'"; and (3) "is not prohibited by but is consistent with the `letter and spirit of the Constitution.'" Morgan, 384 U.S. at 651 (quoting M'Culloch, 17 U.S. at 421).**11**

_____

**8** "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." Id.

**9** "Whatever legislation is appropriate, that is adapted to carry out the objects of the [Reconstruction] amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power." Id.

**10** The test finds textual expression in Section 5 and other enforcement provisions only in the narrow form, "appropriate legislation." Though bare-bones and independently unhelpful, this short-form usage was obviously intended to embody, through "appropriate," the more expansive M'Culloch and Ex parte Virginia formulations. See, e.g., South Carolina, 383 U.S. at 325-26 (referring to M'Culloch test as that to be applied in determining reach of § 2 of Fifteenth Amendment); Morgan, 384 U.S. at 650 & n.9 ("appropriate legislation" language intended to embody M'Culloch test).

**11** The First Circuit in Mills and the Sixth Circuit in Wilson-Jones view differently the significance of the Morgan formulation. The Sixth Circuit considered it a significant refinement and narrowing of the then-evolved test specifically adapted to cabin in the reach of Section 5 power to

8

Applying the test as most recently and relevantly expressed in Morgan, the attempted abrogation here at issue fails that test's first requirement: it may not properly "be regarded as an enactment to enforce the Equal Protection Clause." True, it would in the end remove an inequality of treatment of different classes of persons. True, though that inequality might not itself involve a constitutional violation, it need not do so in order to fall within the prophylactic reach of the Section 5 enforcement power. See Morgan, 384 U.S. at 651; Mills, 118 F.3d at 46. But, it cannot be that Congress's Section 5 enforcement power may "appropriately" be exercised--even for pro-phylactic purposes--to eradicate every classification of persons imposed (or allowed to continue if externally imposed) by a state. See Oregon v. Mitchell, 400 U.S. 112, 127 (1970) ("Nor was the Enforce-ment Clause of the Fourteenth Amendment intended to permit Con-gress to prohibit every discrimination between groups of people.").

Though that basic proposition may be thought self-evident from the very use of the term "appropriate" in enforcement section text and judicial rule, the limits on enforcement power that it implies surely are not--either from constitutional text or judicial decision. Seeking the limits elsewhere, we agree with the First and Sixth Circuits that they are to be found by considering, in light of developed equal pro-tection jurisprudence, whether the particular inequality targeted by the attempted abrogation is such as to justify congressional elimination as a means of enforcing Equal Protection Clause guarantees. See Mills, 118 F.3d at 46-47; Wilson-Jones, 99 F.3d at 209-10.

_____

enforce the open-ended Equal Protection Clause. See Wilson-Jones, 99 F.3d at 209. The First Circuit disagreed, believing that Morgan simply carried the general M'Culloch test forward as it had regularly been applied in determining the reach of specific enforcement provisions. See Mills, 118 F.3d at 45. In the end, as indicated, the two courts came to the same conclusion--that under the proper test as each differently under-stood it, abrogation could not be effected under Congress's Section 5 powers. Though choosing sides on that rather subtle intermediate point of disagreement between those courts is not necessary to our decision, our view is that the essentials of the test have not been intentionally var-ied by its somewhat different formulations over the years.

9

Without recapitulating in full the familiar hierarchy of equal-treatment interests and corresponding protections that has emerged in equal protection jurisprudence, it suffices to observe that the inequality targeted by the attempted abrogation here does not involve any interest at the core of developed equal protection concerns. Public-sector employees are not a recognized "suspect" or "quasi-suspect" group, nor is their interest in any guaranteed level of wages a "fundamental" one. Consequently, the Equal Protection Clause would only afford protection against unequal treatment respecting public-sector employees' entitlement to, or means of securing, FLSA wages if it resulted from arbitrary state action--action that has no rational basis. See Mills, 118 F.3d at 46-47; Wilson-Jones, 99 F.3d at 210. That limited measure of protection therefore defines the end"comprehended by" the Equal Protection Clause, see South Carolina, 383 U.S. at 324 & 326, for guarding against such a non-core inequality of treatment and, accordingly, the limited power of Congress acting under Section 5 to eliminate or prohibit the inequality. To the extent this particular inequality of treatment cannot be laid to arbitrary, irrational state action, an attempt to eliminate it by abrogation could not therefore be "regarded as an enactment to enforce the Equal Protection Clause." Morgan, 384 U.S. at 651.

The specific inequality of treatment here at issue--that resulting from the Commonwealth's Eleventh Amendment immunity to FLSA damage suits in federal court by public-sector, but not private-sector, employees--cannot be laid to any arbitrary, irrational state action. In the first place, it concerns only legal process--access to a federal judicial forum--and not the underlying substantive entitlement to FLSA-mandated wages as to which equality of treatment is already ensured for both groups by substantive provisions of the FLSA as enacted under Congress's Commerce Clause powers. While it is true that in appropriate circumstances the Section 5 power extends to the removal, by abrogation, of precisely this forum-access inequality, see Fitzgerald, just as it extends to the removal of substantive inequalities, see, e.g., Morgan, we think a proper question whenever abrogation is sought to be upheld as an exercise of Section 5 powers is whether legislation removing a related substantive inequality could be upheld on that basis. Put another way, we do not believe that abrogation of Eleventh Amendment immunity to particular actions could be upheld as an appropriate exercise of Section 5 power to enforce the

10

Equal Protection Clause unless legislation to remove a related, underlying substantive inequality could be upheld on that basis. Here, that would require asking whether the FLSA amendments of 1960 and 1966 that extended substantive coverage to public-sector employees could have been upheld as an appropriate exercise of Section 5 powers. They were not upheld on that basis, but as an appropriate exercise of Commerce Clause powers. See Maryland v. Wirtz , 392 U.S. 183, 188-99 (1968). Whether they could also have been upheld under Section 5 has not, therefore, required decision. We are satisfied that they could not be so upheld, because we do not believe that even the provision by state action of unequal minimum wage guarantees for public-sector and private-sector employees could ordinarily be found arbitrary and unreasonable. As the First Circuit pointed out in Mills, "[d]ifferences in the manner, method, and amount of payment that private sector and state employees receive, to the extent they exist, usually flow from a myriad of factors, including state budgetary concerns and the levels of public expenditure and taxation deemed proper by normal political processes." 118 F.3d at 48. Differentiation on the basis of such practical economic and public financing concerns could not easily be considered arbitrary.

If such substantive inequality of treatment by a state could not be considered for equal protection purposes to be arbitrary and unreasonable, hence subject to elimination by Congress under its Section 5 powers, we are satisfied that even less so could be state action whose only effect is to impose (or permit continuation of) an inequality of legal process (not amounting to total preclusion) to vindicate those substantive interests.

Accordingly, we conclude, affirming the district court's ruling, that the attempted abrogation by Congress of the states' Eleventh Amendment immunity to FLSA suits by state employees cannot be upheld as an exercise of Section 5 enforcement powers.

III.

We next consider the employees' fall-back contention that the Commonwealth has implicitly, or constructively, waived, or may have waived, its Eleventh Amendment immunity and consented to

11

suit on these FLSA claims.**12** Specifically, the employees invoke two theories of implied waiver/consent: (1) waiver by operating these facilities after Congress had first extended FLSA coverage to state employees, then clearly stated its intent in the 1974 FLSA amendments that the Commonwealth's employees should be able to sue it on FLSA claims in federal court ("regulated activity" theory); and (2) waiver by participating in federally-funded programs as to which Congress had expressly conditioned participation on the state's consenting to suit in federal court ("exacted consent" theory). As to the "regulated activity" theory, the employees contend that it should now be applied as a matter of law to defeat the Commonwealth's immunity defense, the facts for its application being undisputed on the present record. As to the "exacted consent" theory, the employees contend that the facts may be there to support it in the form of consenting documents in the Commonwealth's possession, and that they should be entitled to discovery to determine whether they do exist. The district court rejected both contentions. We agree with its conclusions as to each.

A.

The "active participation" contention traces back to the doctrine first applied in Parden v. Terminal Ry., 377 U.S. 184, 192 (1964), to hold that by beginning to operate an interstate railroad twenty years after Congress had enacted, under its Commerce Clause power, the Federal Employers' Liability Act (FELA), the State of Alabama had impliedly consented to being sued in federal court by its injured railroad employees on FELA claims.**13** Assuming that after Seminole Tribe the Parden doctrine of implied waiver by a state's participation in activities regulated under the Commerce Clause has continued

_____

**12** No contention is made that the Commonwealth has expressly waived its immunity.

**13** When Parden was decided, its implied waiver holding was not dependent upon Congress's having plainly stated its intention that participation by a state in the regulated activity would be deemed an implied waiver of immunity. That requirement was later imposed as a condition for finding implied waiver in Welch v. Texas Department of Highways & Public Transportation, 483 U.S. 468, 478 (1987) (plurality opinion).

12

vitality, a matter not wholly free of doubt,**14** developments since
Parden have made clear the theory's inapplicability in any event to
the facts here in issue. Not long after Parden  was decided, the
Supreme Court, noting that that case concerned "a rather isolated state

_____

**14** In Seminole Tribe's aftermath, there have been judicial speculations
and one alternative holding by a lower federal court, that the Seminole
Tribe decision may effectively have eviscerated the Parden doctrine of
implied waiver by participation (or by exacted consent). See College Sav.
Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 948 F. Supp.
400, 419 (D.N.J. 1996) (holding implied waiver by participation no lon-
ger possible in view of Seminole Tribe's rejection of Parden's "surren-
der" theory upon which implied waiver doctrine based), aff'd on other
grounds, 131 F.3d 353 (3d Cir. 1997); Digiore v. Illinois, 962 F. Supp.
1064, 1075 (N.D. Ill. 1997) (suggesting possibility on basis that Seminole
Tribe impliedly embraced Justice Scalia's dissenting position in
Pennsylvania v. Union Gas Co., 491 U.S. 1, 43-44 (1989), that Congress
can no more use its Article I power to invite state waivers of immunity
than it can directly abrogate the immunity, but rejecting implied waiver
contention on more narrow grounds); see also Close v. New York, 125
F.3d 31, 40 (2d Cir. 1997) (suggesting that "Parden's viability in light
of Seminole is precarious," but rejecting implied waiver contention on
more narrow grounds).

Other courts, without adverting to the possibility of such a wholesale
evisceration, have assumed continued viability of implied waiver doc-
trine after Seminole Tribe and either found waiver or rejected it on nar-
row merit grounds. See, e.g., Mills, 118 F.3d at 45 (rejecting claim of
implied waiver for failure of proof of plain statement of intent to exact
consent); Premo v. Martin, 119 F.3d 764, 770-71 (9th Cir. 1997) (finding
implied waiver by state participation in cooperative federal-state program
where participation expressly conditioned upon submitting to federal
judicial review of grievance arbitration); U.S. West Communications, Inc.
v. TCG Seattle, 971 F. Supp. 1365, 1369-70 (W.D. Wa. 1997) (same,
essentially).

This court recently has acted on the same unstated assumption that
implied waiver doctrine survives Seminole Tribe . See Booth v. Maryland,
112 F.3d 139, 145 (4th Cir. 1997) (rejecting claim for lack of plain state-
ment of congressional intent to condition participation in federally regu-
lated activity on consent to suit in federal court).

We proceed on the same assumption here, reserving decision on the
broader question. See College Sav. Bank, 131 F.3d at 365 (same).

13

activity," a "railroad business . . . operated`for profit'" in an "area where private persons and corporations normally ran the enterprise," declined to extend its waiver by participation theory to find an implied waiver of immunity to FLSA suits in Missouri's continued operation of non-profit hospitals and other facilities after FLSA coverage was extended to state employees. Employees of the Department of Public Health & Welfare v. Department of Public Health & Welfare, (Missouri Employees), 411 U.S. 279, 284-85 (1973). Noting that to imply consent in respect of such traditionally governmental operations would involve consent to suit by all employees, high and low, "in a state's governmental hierarchy," the Court declined to find waiver. The obvious rationale was that such a wide-ranging waiver could not fairly be implied from no more than a state's continued employment of people to conduct traditional governmental operations, there being no real choice in the matter. Though Missouri Employees was decided before Congress plainly expressed in 1974 its intent that such suits should be allowed, the Missouri Employees rationale surely must survive that expression of Congressional intent. It remains the case that the Commonwealth has done no more in the aftermath of Congress's attempted abrogation of its immunity to FLSA suits (an attempt we have now found ineffectual in any event).**15** We therefore agree with the Second Circuit which, on that rationale, declined to find an implied waiver simply in New York's continuation of traditional non-commercial governmental operations following the FLSA's extension to public employers and Congress's later attempt to abrogate immunity to FLSA suits. See Close , 125 F.3d at 40 (holding that because "New York had employees before the enactment of the FLSA and before it was made applicable to the States, its continued status as an employer cannot realistically be construed as a waiver of immunity") (footnote omitted); see also Digiore, 962 F. Supp. at 1075-76 (noting that as to such essential governmental functions, "[a] state can hardly manifest consent to suit by . . . hiring

_____

**15** It cannot be the case that a constitutionally invalid plain statement of intent to abrogate could nevertheless serve as the valid plain statement of intent to treat state participation as an implied waiver that Welch requires.

14

and paying its employees" "activities that the state has but little choice to engage in").**16**

B.

As indicated, the employees' contention in reliance on the "exacted consent" theory of implied waiver is not that the evidence of record now demonstrates such a waiver, but that because there may have been such consent, they should be allowed discovery to pursue the possibility. The district court denied their motion for the discovery sought and we find no abuse of discretion in that ruling.

Assuming, as we did with respect to the waiver-by-participation contention, that waiver by exacted consent remains a viable doctrine after Seminole Tribe, it would require here a showing (1) that Congress had validly funded a program or programs available for administration by the states in the operation of their prison and mental health facilities, and in doing so had unambiguously conditioned receipt of the federal funding upon the states' waiver of immunity to FLSA suits by employees of those facilities, and (2) that the Commonwealth had received such funding and properly given the consent required as a condition of its receipt. See generally Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985); College Bank, 131 F.3d at 362-63.

The district court denied the motion for discovery on the basis that to warrant it the employees must have made at least a "colorable showing of waiver," and that here they had not done so. Specifically, the court rightly pointed out that it would not suffice to prove waiver

_____

**16** The employees rely on Briggs v. Sagers, 424 F.2d 130 (10th Cir. 1970) and Carey v. White, 407 F. Supp. 121 (D. Del. 1976), both of which held that there was a "choice," though concededly a difficult one, in continuing or dismantling essential governmental operations after the FLSA's extension to state employers and on that basis found implied waivers respecting FLSA claims. The cases are inapposite. Both pre-dated Seminole Tribe, which expressly rejected Parden's "surrender of sovereignty" theory upon which both relied, and both also pre-dated Welch's imposition of a plain statement requirement that was not then or later met in respect of FLSA suits.

15

if discovery revealed no more than that the Commonwealth had participated in federal programs in connection with which it had agreed to comply with all relevant federal laws, including even the FLSA. See Florida Dep't. of Health and Rehabilitative Services v. Florida Nursing Home Ass'n., 450 U.S. 147, 150 (1981). And, the court noted that the employees had identified no specific federally funded program in which the Commonwealth participates that specifically requires waiver as a condition to participation or receipt of funds. Under these circumstances, the court concluded that because the Eleventh Amendment protects states not only from liability, but from "the indignity of . . . coercive process of judicial tribunals at the instance of private parties," discovery should only be permitted upon a colorable showing of waiver not made here. Seminole Tribe, 116 S. Ct. at 1124 (quoting Puerto Rico Aqueduct and Sewer Authority v. Metcalf and Eddy, Inc., 506 U.S. 139, 146 (1993) (internal quotation omitted)). We find no abuse of discretion in that ruling. See Mills, 118 F.3d at 50 (so holding on comparable reasoning).

IV.

We therefore affirm the district court's rulings that Congress's attempted abrogation in 1974 of the states' immunity from FLSA damage suits in federal court was not a valid exercise of its power under the Commerce Clause nor under the enforcement powers conferred by Section 5 of the Fourteenth Amendment; that the Commonwealth had not been proven to have impliedly waived its immunity to such suits; and that the employees' motion for discovery should be denied. Accordingly, we affirm the district court's judgment dismissing the employees' actions.**17**

AFFIRMED

_____

**17** This decision applies only to private damage actions for FLSA violations. It affects none of the other available means for enforcing state employees' substantive FLSA rights. See 29 U.S.C. § 216(c) (damage actions by federal government with remittance to employees); Ex parte Young, 209 U.S. 123 (1908) (private action for injunctive relief against enforcing state official); Testa v. Katt, 330 U.S. 386 (1947) (private action in state court to enforce federal right).

16

BUTZNER, Senior Circuit Judge, dissenting:

I respectfully dissent from the proposition that the Eleventh Amendment bars state employees from suing in federal court to enforce the provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219.

I

Section 1 of the Fourteenth Amendment provides in part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." Section 5 of the Fourteenth Amendment provides: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

Congress cannot define the meaning of "privileges," for this would involve interpreting the Constitution. City of Boerne v. Flores, 117 S. Ct. 2157, 2168 (1997). This responsibility is the province of the judiciary. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176 (1803). Nevertheless, the Fourteenth Amendment confers important enforcement powers on Congress. The Supreme Court has described Congress' function as follows:

> Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into "legislative spheres of autonomy previously reserved to the States."

Boerne, 117 S. Ct. at 2163 (citation omitted).

The first inquiry is to ascertain whether Virginia has made or enforced any law pertaining to its employees' wages. The employees allege that Virginia "under-credits hours worked" and denies them proper compensation. Subject to budgetary constraints enacted by the General Assembly, the power to fix wages is conferred on the Governor who acts after receiving recommendations from the Department of Personnel and Training. Va. Code Ann. § 2.1-114.5 ¶ 2 (Michie 1995 & Supp. 1997). There can be no doubt that Virginia has made and enforced a law that governs its employees' wages.

17

Whether Virginia law pertaining to wages abridges the privileges of citizens of the United States depends on whether the protections of the Fair Labor Standards Act are among such privileges. This requires a judicial inquiry into the constitutional meaning of the term "Privileges."

The opinion in the Slaughter-House Cases, 83 U.S. (16 Wall.) 36 (1873), which is the font of law concerning the Privileges and Immunities Clause, cautions against a broad reading of the Clause. The Court in the Slaughter-House Cases, however, was not concerned with legislation enacted by Congress. Instead, the Court held that the Privileges and Immunities Clause itself [without benefit of congressional legislation] did not prohibit a state legislature from granting a monopoly. It was in this context that the Court cautioned against a broad reading of the Clause.

Distinguished constitutional scholars, beginning with Philip B. Kurland, have recognized the "existent and potential needs that the privileges or immunities clause may be able to meet" if it is not cabined by the caution voiced in the Slaughter-House Cases. Philip B. Kurland, The Privileges and Immunities Clause: Its Hour Come Round at Last?, 1972 Wash. U. L.Q. 405, 418; see also John H. Ely, Democracy and Distrust 22-30 (1980); Laurence H. Tribe, American Constitutional Law 558-59 (2d ed. 1988); Gerald Gunther & Kathleen M. Sullivan, Constitutional Law 429-31 (13th Ed. 1997).

To satisfy judicially imposed constitutional requirements, the Court's opinion in the Slaughter-House Cases explains that a privilege or immunity must owe its "existence to the Federal government, its National character, its Constitution, or its laws." 83 U.S. (16 Wall.) at 79 (emphasis added). Analysis of the Fair Labor Standards Act in accordance with these instructions establishes the following:

The Fair Labor Standards Act owes its existence to the Federal government.

It is National in character. Subject to the Act's statutory exemptions, every wage earner in the United States is brought within its coverage.

18

It was constitutionally enacted pursuant to power conferred on Congress by the Commerce Clause, Article 1 Section 8. See Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985). Congress found that "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" burdened interstate commerce. 29 U.S.C. § 202 (1994).

It is a duly enacted law of the United States, which provides for minimum wages and maximum hours, among other things.

The Fair Labor Standards Act discloses Congress' unequivocal and express intent to abrogate the immunity conferred by the Eleventh Amendment. An employer is defined to include a "public agency," 29 U.S.C. § 203(d); "a public agency" is defined to include a state, § 203(x); an individual employed by a public agency means "any individual employed by a State," § 203(e)(2)(C); a state means "any State of the United States," § 203(c). An action for violation of the Act may be brought against "any employer (including a public agency) in any Federal or State court of competent jurisdiction." § 216(b).

Not only must Congress clearly state its intent to abrogate a state's Eleventh Amendment immunity, but it must act "pursuant to a valid exercise of power." Seminole Tribe of Florida v. Florida, 517 U.S. 44, 55 (1996) (citation omitted). This ultimately depends on whether the protections of the Fair Labor Standards Act are among the privileges of national citizenship protected by the Fourteenth Amendment. Not every law passed by Congress creates such a privilege. The Court has held that the privileges of state citizenship are those that are "fundamental" and those that may be "comprehended under the following general heads: protection by the government, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may prescribe for the general good of the whole." Slaughter-House Cases, 83 U.S. (1 Wall.) at 76. The privileges of United States citizenship are of no less significance.

To determine whether Congress has validly exercised its power to enforce the Privileges and Immunities Clause through Section 5 of the

19

Fourteenth Amendment, one needs to examine what the Supreme Court and other courts have said about the fundamental nature and importance of the Fair Labor Standards Act.

The Supreme Court has affirmed the Act's fundamental importance to the nation. In one of its fullest and earliest expositions, the Court noted that the FLSA is intended

> to protect certain groups of the population from sub-standard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce. The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce. To accomplish this purpose standards of minimum wages and maximum hours were provided.

Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706-7 (1945) (footnotes omitted).

The Court recognized that

> The Fair Labor Standards Act was designed "to extend the frontiers of social progress" by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people.

A.H. Phillips, Inc. v. Walling, 324 U.S. 490, 493 (1945) (citation omitted).

20

The Fair Labor Standards Act "secure[s] for the lowest paid segment of the Nation's workers a subsistence wage" and assures the maintenance of a minimum living standard. D.A. Schulte, Inc. v. Gangi, 328 U.S. 108, 116 (1946); see also Wirtz v. Ti Ti Peat Humus Co., 373 F.2d 209, 212 (4th Cir. 1967).

"[T]he FLSA was designed to give specific minimum protections to individual workers and to ensure that each employee covered by the Act would receive a fair day's pay for a fair day's work and would be protected from the evil of overwork as well as underpay." Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981) (internal quotation marks and citation omitted).

"The Fair Labor Standards Act is a major enactment by Congress of social and economic policy, intended to protect certain groups of the population from substandard wages and excessive hours. . . ." Foremost Dairies, Inc. v. Wirtz, 381 F.2d 653, 655 (5th Cir. 1967).

"The purpose of the Act . . . was not to regulate interstate commerce as such, but to eliminate, as rapidly as practicable, substandard labor conditions throughout the nation." Mitchell v. Empire Gas Eng'g Co., 256 F.2d 781, 783 (5th Cir. 1958).

The Act restores bargaining power to workers to prevent their exploitation. See Isaacson v. Penn Community Servs., Inc., 450 F.2d 1306, 1310 (4th Cir. 1971); McComb v. Homeworkers' Handicraft Coop., 176 F.2d 633, 636 (4th Cir. 1949).

The Act is "comprehensive in its purpose and remedial in character." Missel v. Overnight Motor Transp. Co. , 126 F.2d 98, 103 (4th Cir.), aff'd, 316 U.S. 572 (1942).

These excerpts from judicial opinions establish that the protections of the Fair Labor Standards Act are among the privileges secured by the Privileges and Immunities Clause.

II

Dissenting, I conclude that the Fair Labor Standards Act is remedial legislation that protects privileges of national citizenship guaran-

21

teed by Section 1 of the Fourteenth Amendment. A state may not enact any law that abridges these privileges. Congress has expressed an intent in the Act to abrogate States' Eleventh Amendment immunity. The Fair Labor Standards Act is appropriate legislation enacted by Congress, pursuant to Section 5 of the Fourteenth Amendment, to enforce the Privileges and Immunities Clause.

22