**Revised August 29, 2000**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 99-30242
_____

JANICE KAZMIER,

Plaintiff-Appellee,

and

UNITED STATES OF AMERICA,

Intervenor Plaintiff-Appellee,

versus

MARY WIDMANN, individually and in her official capacity as Chief attorney for the Louisiana Department of Social Services;

STEVEN L. MAYER, individually and in his official capacity as General Counsel for the Louisiana Department of Social Services;

GLORIA BRYANT-BANKS, Individually and in her official capacity as Secretary of the Louisiana Department of Social Services;

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

August 25, 2000

Before GARWOOD, WIENER, and DENNIS, Circuit Judges.

WIENER, Circuit Judge:

Defendants-Appellants, all officials of the Louisiana Department of Social Services (collectively "LDSS"), appeal from the district court's denial of their motions to dismiss on grounds of sovereign immunity (sometimes, "Eleventh Amendment immunity") a

complaint brought against LDSS by Plaintiff-Appellant Janice Kazmier under the Family and Medical Leave Act ("FMLA").[1] As we conclude that the particular provisions of the FMLA that are at issue in the instant case do not validly abrogate the State of Louisiana's sovereign immunity, we reverse and remand with instructions to dismiss Kazmier's action.

## I
## Facts and Proceedings

Kazmier was fired by LDSS after she took several weeks leave during 1995: She took at least one month of leave beginning in May of 1995 after breaking her arm in a bicycling accident, and took at least one more week of leave at the beginning of October 1995 to care for her terminally ill father. In addition, after breaking her wrist later that month, Kazmier failed to return to work for the rest of the calendar year. As a result of Kazmier's absences, LDSS terminated her employment on January 4, 1996.

Kazmier filed suit against LDSS in federal district court early in 1997, alleging that LDSS's termination of her employment violated several provisions of the FMLA. LDSS filed a motion to dismiss, contending that Kazmier was barred by the Eleventh Amendment from prosecuting her suit in federal court. The United States intervened on Kazmier's side, arguing that the FMLA validly abrogates the States' Eleventh Amendment immunity. The district court denied LDSS's motion to dismiss, and this appeal followed.

---

[1] 29 U.S.C. §§ 2601 et seq.

II
Analysis

The Eleventh Amendment is rooted in the principle, imprecisely stated in its text but implicit in the federal structure of the Constitution, that the federal courts do not have jurisdiction to hear suits brought by private individuals against nonconsenting States.[2] This jurisdictional bar is not, however, absolute: The States' sovereign immunity can be abrogated by Congress pursuant to its enforcement power under Section 5 of the Fourteenth Amendment.[3] The validity of a purported abrogation is assessed judicially by applying a two-part test: First, "Congress must unequivocally express[] its intent to abrogate the immunity";[4] and, second, Congress must act "pursuant to a valid exercise of power."[5]

Kazmier contends that the FMLA validly abrogates the States' Eleventh Amendment immunity, making LDSS amenable to suit in federal court. Conceding arguendo that in enacting the FMLA Congress unequivocally expressed its intent to abrogate such immunity, LDSS insists that Congress failed to effect the intended abrogation pursuant to a valid exercise of power. Thus, the only issue before us is whether Congress's intent to make the pertinent

---

[2] See, e.g., Kimel v. Florida Board of Regents, __ U.S. __, __, 120 S.Ct. 631, 640 (2000) ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States").

[3] Id at __, 120 S.Ct. at 644.

[4] Seminole Tribe of Florida v. Florida, 517 U.S. 44, 55 (1996).

[5] Id.

3

provisions of the FMLA applicable to the States was validly enacted into law pursuant to Congress's enforcement power under Section 5 of the Fourteenth Amendment.

Section 1 of the Fourteenth Amendment states that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."[6] Section 5 of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article."[7] Kazmier and the United States argue that the FMLA is a valid congressional enforcement of the Fourteenth Amendment's guarantee that "[n]o State shall... deny to any person within its jurisdiction the equal protection of the laws."

"It is for Congress in the first instance to determine whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment, and its conclusions are entitled to much deference."[8] The Supreme Court has noted, however, that "the same language that serves as the basis for the affirmative grant of congressional power also serves to limit that power."[9] "Congress

---

[6] U.S. CONST. amend. XIV, § 1.

[7] U.S. CONST. amend. XIV, § 5.

[8] Kimel, __ U.S. at __, 120 S.Ct. at 644 (citations omitted).

[9] Id (quotations and citations omitted).

4

cannot decree the substance of the Fourteenth Amendment's restriction on the States.... It has been given the power ‹to enforce,' not the power to determine what constitutes a constitutional violation."[10]  Thus, Congress's exercise of its Section 5 enforcement power is always authorized when enacting strictly remedial legislation that narrowly targets clearly unconstitutional State conduct.[11]  In contrast, Congress can enact broad prophylactic legislation that prohibits States from engaging in conduct that is <u>constitutional</u> only when there is "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."[12]

The Supreme Court's recent decision in <u>Kimel v. Florida Board of Regents</u>[13] provides the clearest guidance for determining whether legislation that purports to enforce the Fourteenth Amendment's Equal Protection Clause against the States is "congruent and proportional."  A two part test emerges from <u>Kimel</u>.  At the first step, we begin our analysis by determining what type of constitutional violation the statute under review is designed to prevent.  The outermost limits of Congress's potential authority to enact prophylactic legislation is directly linked to the level of scrutiny that we apply in assessing the validity of discriminatory

---

[10] <u>Id</u> (quotations and citations omitted).

[11] <u>Id</u> (quotations and citations omitted).

[12] <u>Id</u> (quotations and citations omitted).

[13] __ U.S. __, 120 S.Ct. 631 (2000).

classifications of the targeted type.  If legislation "prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection... standard,"[14] the legislation will not be considered congruent and proportional.  Thus, Congress's authority is most broad when "we require a tight[] fit between [the discriminatory classifications in question] and the legitimate ends they serve," as we do with classifications that are based on race or sex.[15] Conversely, congressional authority is most narrow when Congress tackles discrimination on the basis of classifications that are not constitutionally suspect:  "States may discriminate on the basis of [such classifications] without offending the Fourteenth Amendment if the... classification in question is rationally related to a legitimate state interest."[16]

Having established, at <u>Kimel</u>'s first step, the limits of Congress's <u>potential</u> authority under Section 5, we examine, at <u>Kimel</u>'s second step, the legislative record of the statute under review to see whether it contains evidence of <u>actual constitutional violations by the States</u> sufficient to justify the full scope of the statute's provisions.[17]  The respect that must be accorded the

---

[14] <u>Kimel</u>, 527 U.S. at __, 120 S.Ct. at 647.

[15] <u>Kimel</u>, 527 U.S. at __, 120 S.Ct. at 646.

[16] <u>Id</u>.

[17] <u>City of Boerne v. Flores</u>, 521 U.S. 507, 531 (1997); <u>Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank</u>, 527 U.S. 627, __, 119 S.Ct. at 2207 (1999).

States as independent sovereigns within our federal system prevents Congress from restraining them from engaging in constitutionally permissible conduct based on nothing more than the mere invocation of perceived constitutional bogeymen:  Legislation that abrogates immunity must be proportional with and congruent to an <u>identified pattern</u> of actual constitutional violations by the States.[18]  If Congress "fail[s] to [include in the legislative record of a prophylactic statute any evidence of a] significant pattern of unconstitutional discrimination" by the States, then the statute will not be held to abrogate the States' sovereign immunity.[19]

A.   Scope of Review

Section 2612(a)(1) of the FMLA[20] entitles eligible employees to take leave totaling twelve weeks per calendar year:

> (A)  Because of the birth of a son or daughter and in order to care for such son or daughter;
> (B)  Because of the placement of a son or daughter with the employee for adoption or foster care;
> (C)  In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.
> (D)  Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

Kazmier has alleged that her employment with LDSS was terminated because she took leave (1) to care for her terminally father and (2) to recuperate from personal injuries.  Consequently, of the

---

[18] <u>Kimel</u>, 527 U.S. at __, 120 S.Ct. at 648-50.

[19] <u>Id</u>, 527 U.S. at __, 120 S.Ct. at 647.

[20] 29 U.S.C. § 2612(a)(1).

section's four justifications for leave under the FMLA, only subsections (C) and (D) are implicated in the instant case.

As subsections (C) and (D) clearly authorize leave on different substantive grounds, logic dictates that each must be subjected to an independent "congruence and proportionality" analysis. Although we have been unable to locate any case law expressly addressing the issue of severability in the context of congruence and proportionality analysis,[21] we discern no reason why the provisions of one of the FMLA's subsections could not validly abrogate the States' Eleventh Amendment immunity even if the provisions of some or all of the remaining subsections fail to do so. We shall therefore evaluate the congruence and proportionality of subsections (C) and (D) separately.

B.  Subsection (C)

This subsection requires employers to permit each eligible employee to take some or all of his 12 weeks FMLA annual leave to provide care for family members suffering from serious health conditions. Congress's express intent in enacting this provision was to prevent employers from granting such leave discriminatorily on the basis of sex.[22] Specifically, Congress was responding to

---

[21] We do note, however, that in a recent decision the Eleventh Circuit chose to analyze the validity of the FMLA's purported abrogation of State sovereign immunity on a subsection-by-subsection basis. See Garrett v. University of Alabama, 193 F.3d 1214 (11th Cir. 1999).

[22] The FMLA's statement of purpose reflects that one of its primary purposes is to "minimize[] the potential for employment discrimination on the basis of sex by ensuring generally that leave

8

findings that <u>private</u> sector employers frequently discriminate against <u>men</u> in granting leave to provide family care.[23]  Testimony before Congress indicated that the perverse effect of this reverse discrimination has actually been to push <u>women</u> out of the work force, largely because such discrimination is both rooted in and reinforces the stereotype that women will assume the role of the primary family care-giver.  According to the testimony before Congress, such stereotypes make employers less willing to hire women because of the expectation that women will take significantly more leave time to care for members of their families than will men.[24]

Discrimination on the basis of sex is subject to "heightened" constitutional scrutiny.[25]  Sexual classifications are

---

is available for... compelling family reasons, on a gender-neutral basis."  29 U.S.C. § 2601(b)(4).

[23] <u>See</u> <u>The Parental and Medical Leave Act of 1987: Hearings on S.249 Before the Subcommittee on Children, Families, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources</u>, Part 2, 100th Cong. 536 (1987) (Statement of Professor Susan Deller Ross, Georgetown University Law Center) ("[T]here are a number of studies ... in which it's shown that employers in this country that are giving family leaves to their workers are not giving it non-discriminatorily, they are, by and large, giving it only to women, not to men.  It's fairly flagrant discrimination.")

[24] <u>See</u> <u>The Family and Medical Leave Act of 1991: Hearing on S.5 Before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources</u>, 102d Cong. 10 (1991) (Statement of Senator Adams) ("[T]he reality today is that women are the primary caregivers for elderly parents. ... It is the daughters, whether biological or through marriage, that account for the majority of caregivers.").

[25] <u>See</u> <u>United States v. Virginia</u>, 518 U.S. 515, 533 (1996).

constitutional only if they serve "important governmental objectives and ... the discriminatory means employed are substantially related to the achievement of those objectives."[26] Thus, Congress <u>potentially</u> has wide latitude under Section 5 to enact broad prophylactic legislation designed to prevent the States from discriminating on the basis of sex.

The mere invocation by Congress of the specter of sex discrimination, however, is insufficient to support the validity of legislation under Section 5, at least when the statute at issue prohibits the States from engaging in a significant amount of conduct that is constitutional. Broad, prophylactic legislation must be congruent with and proportional to <u>actual</u>, <u>identified</u> constitutional violations by the States.[27] Yet in enacting the FMLA, Congress identified no pattern of discrimination by the States with respect to the granting of employment leave for the purpose of providing family care. Congress did make findings of such discrimination in the <u>private</u> sector, but such evidence is not imputable to the <u>public</u> sector to validate abrogation: The Supreme Court ruled in <u>Kimel</u> that findings of private sector discrimination do not create an inference that similar discrimination has occurred

---

[26] <u>Mississippi Univ. for Women v. Hogan</u>, 458 U.S. 718, 724 (1982) (citation omitted).

[27] <u>See</u> <u>City of Boerne</u>, 521 U.S. at 531-32; <u>Florida Prepaid</u>, 527 U.S. at __, 119 S.Ct. at 2207; <u>Kimel</u>, __ U.S. at __, 120 S.Ct. at 648-50.

in the public sector.[28]  Simply put, we will not infer from private sector conduct that the States are wilfully violating their constitutional duty to refrain from engaging in sex discrimination.

It is indisputable that Subsection (C) constitutes broad, prophylactic legislation:  There is nothing in the Constitution that even closely approximates either a duty to give all employees up to twelve weeks of leave per year to care for ailing family members or a right of an employee to take such leave.  In fact, as the legislative record for this provision is devoid of evidence of public sector discrimination, there simply are no identified constitutional violations to which the provision could possibly be "congruent and proportional."  If subsection (C) were solely remedial in nature, the absence of evidence of constitutional violations might not present a problem.  But the provisions of this subsection are, instead, prophylactic in nature, purporting to prohibit the States from engaging in a broad swath of conduct that is not per se violative of the Equal Protection Clause.[29]  We conclude, therefore, that Congress did not validly enact subsection (C) pursuant to its enforcement power under Section 5; that subsection (C) does not effectively abrogate the States' Eleventh

---

[28] Kimel, __ U.S. at __, 120 S.Ct. at 649 ("Finally, the United States' argument that Congress found substantial age discrimination in the private sector... is beside the point.  Congress made no such findings with respect to the States.").

[29] It would be perfectly constitutional, for example, for a State to provide employees with only eight weeks of leave per year to provide family care.

11

Amendment immunity; and that Kazmier cannot enforce that subsection against the State of Louisiana in federal court.[30]

C.    Subsection (D)

This subsection requires employers to permit each eligible employee to take some or all of his 12 weeks FMLA annual leave to address the employee's own "serious health conditions."  Congress's express intent in enacting this provision was to prevent employers from discriminating on the basis of temporary disability.[31]  The legislative record contains the additional suggestion that Congress meant for this provision to prevent discrimination against women on the basis of pregnancy-related disability as well.[32]  Kazmier and the United States argue that this latter concern indicates that, like subsection (C), subsection (D) is ultimately designed to prevent discrimination on the basis of sex.

---

[30] See Sims v. University of Cincinnati, __ F.3d __, 2000 WL 973501 (6th Cir. 2000) (reaching the same result).

[31] See H.R. Rep. No. 99-699, Part 2, at 25 (1986) ("[A] worker who has lost a job due to a serious health condition faces future discrimination in finding a job which has even more devastating consequences for the worker and his or her family."); Family and Medical Leave Act of 1989:  Hearing on S.345 Before the Subcommittee on Children, Family, Drugs, and Alcoholism of the Senate Committee on Labor and human Resources, 101st Cong. 26-27 (1989) (testimony of Ms. Barbara Hoffman, Vice President of the National Coalition for Cancer Survivorship) (stating that the "disparate treatment" of cancer survivors "includes dismissal, demotion, and loss of benefits" and that "[s]uch discrimination against qualified employees costs society millions of dollars in lost wages, lost productivity and needless disability payments").

[32] See 29 U.S.C. § 2601(a)(6) ("[E]mployment standards that apply to one gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender.").

12

As an initial matter, we reject the notion that subsection (D) targets sex discrimination. The legislative record demonstrates that Congress was concerned with discrimination on the basis of pregnancy, which is not the same thing as broad based discrimination on the basis of sex. The Supreme Court has held that discrimination on the basis of pregnancy does not violate the Equal Protection Clause.[33] To the extent that subsection (D) targets such discrimination, it does not fall within Congress's enforcement powers under Section 5 of the Fourteenth Amendment.

The United States asserts that even though subsection (D) expressly targets only discrimination in the granting of employment leave, the provision was nevertheless intended to have the secondary effect of preventing employers from engaging in discriminatory hiring practices. Specifically, the United States asserts that Congress enacted subsection (D) in response to evidence indicating that employers often are reluctant to hire women because of "the assumption that women will become pregnant and leave the labor market."[34] The United States asks us to infer from Congress's consideration of this evidence that even if subsection (D) is not designed to prevent discrimination on the basis of sex in the granting of leave, it is nevertheless designed

---

[33] Geduldig v. Aiello, 417 U.S. 484 (1974).

[34] See The Parental and Medical Leave Act of 1986: Joint Hearing on H.R. 4300 Before the Subcommittee on Labor-Management Relations and the Subcommittee on Labor Standards of the House Committee on Education and Labor, 99th Cong. 36, 42 n.48 (1986) (excerpt from brief of the American Civil Liberties Union).

13

to prevent discrimination on the basis of sex in the making of hiring decisions.

This argument is flawed on a number of levels. First, we note that, of Section 2612(a)(1)'s four justifications for leave, subsection (A) is the one that most plausibly is designed to combat pregnancy-related discrimination, as that subsection entitles employees to take leave "[b]ecause of the birth of a son or daughter and in order to care for such son or daughter." Second, to the extent that subsection (D) does target discrimination related to pregnancy, the argument advanced by the United States appears impermissibly to conflate discrimination on the basis of pregnancy with discrimination on the basis of sex, an approach that, as we already have noted, has been rejected by the Supreme Court.[35]

Ultimately, however, we need not delve too deeply into the true nature of the targeted discrimination, as we find it virtually impossible to conceive how requiring employers to permit employees to take 12 weeks of leave for serious health conditions could possibly have the effect of preventing sex discrimination in hiring practices. If the United States is correct in surmising that employers are reluctant to hire women for fear that they will become pregnant and "leave the labor market," then the only possible effect on hiring practices of expressly mandating leave for pregnancy (among other serious health conditions) would be to

---

[35] See Geduldig v. Aiello, 417 U.S. 484 (1974).

14

reinforce such fears and make employers even more reluctant to hire women. A provision mandating that employers grant leave for serious health conditions cannot be viewed as reasonably calculated to achieve the objective of making employers less disinclined to hire women. Again, therefore, we reject the notion that subsection (D) is designed to combat sex discrimination.

What is patently clear, though, is that subsection (D) was designed by Congress to prevent discrimination on the basis of temporary disability.[36] Unlike discrimination on the basis of sex, however, discrimination on the basis of disability is subject only to the slightest of scrutiny under the Equal Protection Clause.[37] States may discriminate on the basis of disability without offending the Fourteenth Amendment as long as the classification in question is rationally related to a legitimate state interest.[38] In this respect, disability discrimination is similar to age discrimination, so subsection (D) is properly subject to the kind of analytical approach employed by the Supreme Court in Kimel to determine whether the Age Discrimination in Employment Act ("ADEA")

---

[36] We note that pregnancy does fall within the definition of disability that is supplied by the statute, as pregnancy is a serious health condition that may affect the ability of an employee to perform work.

[37] City of Cleburne v. Cleburne Living Center, 473 U.S. 432, (1985).

[38] Id at 442 ("[W]e conclude for several reasons that the Court of Appeals erred in holding mental retardation a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation.").

15

validly abrogates State sovereign immunity.[39]

Even a cursory look makes clear that, like the ADEA, the FMLA "prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard."[40]  It would not, for example, be unconstitutional for a State to permit its employees to take only eight weeks leave per year because of serious health conditions.  For that matter, it would not be unconstitutional for a State to allow its employees no health related leave time at all, as long as in doing so the State applied the rule on a nondiscriminatory basis.  In sum, subsection (D) prohibits the States from engaging in such a wide array of perfectly constitutional practices that we have difficulty conjuring up <u>any</u> unconstitutional conduct by the States to which that subsection's proscriptions might possibly be proportional and congruent.[41]

We need not engage in such counterfactual speculation, however, to resolve the instant case.  The legislative record for the FMLA is devoid of any evidence of a pattern of discrimination by the States against the temporarily disabled; and the public

---

[39] 29 U.S.C. § 621 <u>et seq.</u>

[40] <u>Kimel</u>, __ U.S. at __, 120 S.Ct. at 647.

[41] <u>See</u> <u>id</u> at 645 ("Initially, the substantive requirements the ADEA imposes on state and local governments are disproportionate to any unconstitutional conduct that conceivably could be targeted by the Act.").

16

sector cannot be tarred with the brush of private sector discrimination to create an inference of unconstitutional discrimination by the States.[42] "Congress' failure to uncover any significant pattern of unconstitutional discrimination here confirms that Congress had no reason to believe that broad prophylactic legislation was necessary in this field."[43] Without direct evidence of substantial unconstitutional discrimination by the States, there simply is no "Fourteenth Amendment evil" to which subsection (D) could possibly be congruent and proportional.[44] We conclude, therefore, that Congress did not validly enact subsection (D) pursuant to its enforcement power under Section 5; that subsection (D) does not effectively abrogate the States' Eleventh Amendment immunity; and that Kazmier cannot enforce that subsection against the State of Louisiana in federal court.

As a final point, we reject the argument advanced by Kazmier and the United States that, by stare decisis, our holding in Coolbaugh v. State of Louisiana,[45] to the effect that Title II of the Americans with Disabilities Act of 1990 ("ADA")[46] does validly

---

[42] Id at 649 ("[T]hat Congress found substantial... discrimination in the private sector... is beside the point. Congress made no such findings with respect to the States.").

[43] Id at 650.

[44] Florida Prepaid, 527 U.S. at __, 119 S.Ct. at 2207 (citation and quotations omitted).

[45] 136 F.3d 430 (5th Cir. 1998).

[46] 42 U.S.C. §§ 12131-12165 (1994).

17

abrogate the States' Eleventh Amendment immunity, controls our decision today with respect to the validity of Congress's abrogation of State sovereign immunity by enacting subsection (D). As an initial matter, we note that the continuing validity of Coolbaugh has been called seriously into question by the Supreme Court's subsequent decision in Kimel which, in holding that Congress did not validly abrogate State sovereign immunity in enacting the ADEA, reversed another panel decision from this Circuit.[47]  The Coolbaugh panel appears to have inferred a pattern of unconstitutional discrimination by the States from evidence in the ADA's legislative record pertaining solely to discrimination in the private sector, an inference that the Court in Kimel made clear is impermissible.  We need not re-examine the holding of Coolbaugh in detail, however, because the ADA is an entirely different statute than the FMLA, with its own distinguishable substance and its own distinguishable legislative record.  For present purposes we need observe only that the legislative record of the FMLA, lacking any evidence whatsoever of unconstitutional discrimination by the States, will not support abrogation of State sovereign immunity, at least not with respect to those of the FMLA's prophylactic provisions that are at issue in this case.  Coolbaugh therefore does not proscribe our concluding that, like subsection (C), subsection (D) was not validly enacted pursuant to Congress's

---

[47] See Scott v. University of Mississippi, 148 F.3d 493 (5th Cir. 1998), overruled by Kimel, __ U.S. __, 120 S.Ct. 631 (2000).

18

enforcement power under Section 5 of the Fourteenth Amendment and therefore does not abrogate the States' Eleventh Amendment immunity.[48]

## III
## A Response to the Dissent

The extensive research that has obviously gone into the dissent, and the scholarly work that it has produced, merit a brief response. The dissent chides us for "look[ing] at <u>Boerne</u> and all of the prior [Eleventh Amendment] jurisprudence through the wrong end of <u>Kimel</u>'s perspective glass."[49] It then attempts to reinterpret the Supreme Court's recent Eleventh Amendment jurisprudence through the antient lens of Chief Justice Marshall's 1819 opinion in <u>McCulloch v. Maryland</u>.[50] The thrust of the dissent's argument is that the "congruence and proportionality" test employed by the Supreme Court in <u>Kimel</u>, <u>City of Boerne</u>, and <u>Florida Prepaid</u> is in actuality nothing more than a "rational basis" standard of review.[51] The dissent contends that if we

---

[48] <u>See</u> <u>Hale v. Mann</u>, __ F.3d __, 2000 WL 675209 (2d Cir. 2000) (reaching the same result).

[49] Dissent at 2.

[50] 17 U.S. (4 Wheat.) 316, 421 (1819).

[51] Although the dissent accuses us of obstructing coherent dialogue by conflating rational means review with rational basis review, the dissent fails to articulate any substantive difference between rational basis review and the standard that it proposes. Rather than fence with the ghost of the dissent's imagined standard, we have labeled the dissent's approach "rational basis review" in an attempt to lend it an established framework of substantive content.

conclude that the FMLA is rationally related to deterring sex discrimination (which the dissent apparently concludes it to be),[52] we are obligated to uphold the validity of its purported abrogation of State sovereign immunity.

The dissent's approach to Eleventh Amendment jurisprudence is not supported by the law, and even as a matter of legal theory it is riddled with problems. The dissent contends that "Kimel and [City of] Boerne reaffirmed and did not limit or replace the McCulloch 'rational means' standard." In reality, however, McCulloch is nowhere mentioned in Kimel, and City of Boerne merely cites McCulloch for the well-established and universally accepted truism that "[u]nder our Constitution, the Federal government is one of enumerated powers."[53] Indeed, the Court did not use the phrases 'rational means' or 'necessary and proper' even once in either of those two opinions. Simply put, McCulloch has absolutely nothing to do with the Supreme Court's recent Eleventh Amendment jurisprudence: Chief Justice Marshall's interpretation of the Necessary and Proper Clause was certainly a landmark decision with far-reaching implications, but it sheds no useful light on the difficult and intractable problems entailed in reconciling Congress's enforcement powers under Section 5 of the Fourteenth

---

[52] We note in passing that the FMLA does not directly prohibit sex discrimination at all. For example, under the FMLA it would be perfectly permissible for an employer to grant 15 weeks of leave per year to female employees while granting only 12 weeks of leave per year to males.

[53] 521 U.S. 507, 516 (1997).

Amendment with the bedrock principles of State sovereign immunity embodied in the Eleventh Amendment.

Moreover, the dissent's contention that the Supreme Court's congruence and proportionality test amounts to nothing more than a rational basis standard of review just cannot be right. First, the Supreme Court is well accustomed to using a rational basis standard of review in testing the validity of legislation;[54] if that is the only yardstick that the Court meant to apply in the context of the Eleventh Amendment, it would not have gone to the trouble of articulating a separate congruence and proportionality test. Second, neither the ADEA (the statute at issue in Kimel) nor RFRA (the statute at issue in City of Boerne) can be fairly characterized as irrational, yet the Court struck down both of those statutes after applying its congruence and proportionality test. It could not be clearer that congruence and proportionality is a considerably more stringent standard of review than is rational basis. Indeed, these two tests bear little resemblance to one another, as they are rooted in entirely separate clauses of the Constitution.[55] Professor Laurence Tribe might agree with the dissent, which cites several of his pre-Kimel articles, but the support of even so prominent an academician is an inadequate

---

[54] See, e.g., McGowan v. Maryland, 366 U.S. 420 (1961).

[55] "Rational basis" review is an equal protection standard rooted in Section 1 of the Fourteenth Amendment, whereas the "congruence and proportionality" test defines the outermost limits of Congress's enforcement powers under Section 5 of the Fourteenth Amendment.

21

substitute for rigorous adherence to recent Supreme Court precedent.

At its close, the dissent argues that the legislative record compiled by Congress in enacting the FMLA contains sufficient evidence of unconstitutional discrimination by the States to support abrogation of State sovereign immunity with respect to 29 U.S.C. § 2612(a)(1)(C) and (D). Despite scouring what it admits to be nine years of legislative history, the dissent is able to point to only six statements made during congressional hearings, which, it contends, demonstrate that in enacting Subsections (C) and (D) Congress was attempting to redress a pervasive pattern of sex-based discrimination that existed in the public sector at the time that the FMLA was enacted. Even a cursory review of those six statements, however, reveals that they are not in the least probative of the question before us. Every single one of the six quotations relates solely to the issue of <u>parental leave</u>, an issue that is not addressed by Subsections (C) and (D) of the FMLA and that we have expressly declined to address and rule on in deciding the case before us. Further evidence of the unpersuasiveness of the six statements is the fact that one of them deals solely with discrimination in the private sector;[56] one of them deplores the absence of robust parental leave policies in the public and private sectors, but without making any mention whatsoever of sex-based

---

[56] <u>See</u> S.Rep. No. 103-3, at 14-15 (presenting statistics relating to parental leave for "employees working in private business" and a survey of "253 U.S. corporations").

22

discrimination in the granting of such leave;[57] a third actually lauds the public sector for making parental leave readily available to employees, contending that the public sector has set an example that the private sector should emulate;[58] and a fourth, which was made during a hearing held in 1987 and which asserted that at that time —— 13 years ago —— the State of Florida granted its employees maternity leave but not paternity leave, was no longer true when the FMLA was enacted in 1993, by which time Florida had already enacted a general parental leave policy available to both sexes on a neutral basis.[59]  Whether the two or three remaining anecdotal and outdated statements on which the dissent is left to rely would be

---

[57] See Parental and Medical Leave Act of 1986: Hearings on H.R. 4300 Before the Subcomm. On Labor Management Standards, 99th Cong., 30, 147 (testimony of Meryl Fran, Director of the Yale Bush Center Infant Care Leave Project, deploring the fact that "American women have no statutory right to parental leave").

[58] See Parental and Medical Leae Act of 1987: Hearings on S.249 Before the Subcomm. On Children, Family, Drugs and Alcoholism, 100th Cong., 338 (testimony of Gerald McEntee, International President, American Federation of State, County, and Municipal Employees, that "one conclusion which can be drawn is that a vast number of employees in the State and local government sector already have the right to take unpaid parental leave or maternity leave for periods in excess of 18 weeks.  Ninety percent of the employees covered in the sample, or 650,000 people, already had the right to a leave of four months or more.  Clearly, parental leave is a fact of life in the public sector. ... And if government at all levels can live with unpaid parental leave, then so can private industry.").

[59] See Fl. St. § 110.221 (1991) (providing parental leave "for the father or mother of a child who is born to or adopted by that parent.").  The fact that Florida changed its parental leave policy in 1991 to make leave available to parents of both sexes indicates that other testimony relied on by the dissent, stating that in 1989 13 states granted family leave to women but not to men, was similarly outdated and unreliable by the time that the FMLA was enacted in 1993.

23

sufficient to support abrogation of State sovereign immunity with respect even to legislation pertaining to parental leave is thus subject to considerable doubt:  In Kimel, the Supreme Court explained that its ruling in City of Boerne was rooted in its conclusion that "Congress had uncovered only 'anecdotal evidence' [of discrimination by the State] that, standing alone, did not reveal a 'widespread pattern of religious discrimination in this country.'"[60]  We note again, however, that the validity of the FMLA's parental leave provisions is not at issue in this case. Today we hold only that Congress failed to present sufficient evidence of unconstitutional discrimination by the States to support abrogation of State sovereign immunity with respect to Subsections (C) and (D), both of which the dissent fails to address squarely.

In fact, the dissent devotes no analysis at all to Subsection (D):  Although it baldly declares that it cannot agree "that the legislative record for this provision is devoid of evidence of public sector discrimination against the temporarily disabled as this was precisely what the PDA and then the FMLA were enacted in response to,"[61] the dissent does not support its disagreement by pointing to any evidence pertaining to such discrimination by the States.  Indeed, as the temporarily disabled are not a

---

[60] __ U.S. at __, 2000 WL 14165 at *13, citing City of Boerne, 521 U.S. at 531.

[61] Dissent at 43 (internal quotation marks omitted).

24

constitutionally suspect class, the dissent's own analysis would seem to indicate that Subsection (D) is entitled to substantially less deference than are the other sections of the FMLA.[62] Unfortunately, the dissent's total failure to analyze Subsections (C) and (D) individually precludes a more detailed response to the positions that it takes.[63]

In the end, the dissent's citations to the legislative record only serve to reinforce our conclusion that the FMLA is not designed to prevent discrimination at all, but rather is crafted to provide employees throughout the nation with a substantive statutory right to take leave from work for family and medical reasons. The dissent has managed to find but two potentially relevant remarks — stray ones at that — pertaining to discrimination in the public sector, each of which was made offhand, does not appear to have been solicited by Congress, and is greatly overshadowed by the speaker's plea that Congress enact a

---

[62] See Dissent at 10-14 (noting that Congress is entitled to substantially less deference in enacting prophylactic legislation that is purportedly designed to prevent discrimination on the basis of classifications that are not constitutionally suspect).

[63] The dissent appears to take the position that we must either uphold or strike down the FMLA in its entirety, despite the fact that only two of its four substantive provisions are at issue here. See Dissent at 29. The dissent cites no authority for its position, even though it would require breaking with both the Second and Eleventh Circuits. See Garrett, 193 F.3d 1214 (11th Cir. 1999), Hale, __ F.3d __, 2000 WL 675209 (2d Cir. 2000). Moreover, the dissent's all-or-nothing approach would give Congress virtually unlimited authority to pass clearly unconstitutional provisions merely by tacking them onto statutes that are otherwise constitutional, a result that simply cannot be right.

25

statutory right to parental leave.  In fact, in several instances the congressional testimony cited by the dissent emphasizes the paramount importance of maternity leave as distinguished from paternity leave, ironic indeed considering the dissent's attempt to use this testimony to demonstrate that Congress's primary concern was that family and medical leave be dispensed on a non-discriminatory basis.[64]

Although the dissent clearly agrees with the substantive goals that Congress was trying to achieve in enacting Subsections (C) and (D), the wisdom of individual policy decisions is irrelevant to determining the validity of congressional abrogation of State sovereign immunity.  Because of the dissent's failure to acknowledge this basic legal principle, as well as the reasons discussed above, we find the dissent unconvincing.

IV
Conclusion

---

[64] See, e.g., Parental and Medical Leave Act of 1987: Hearings on S.249 Before the Subcomm. On Children, Family, Drugs and Alcoholism, 100th Cong., 365-70 (testimony of Elaine Gordon, Member of the Florida House of Representatives, stating that "[t]here must be come official commitment to acknowledging motherhood as a societal function and stating that those who combine work and childbearing shall not be penalized," and noting that to that end she had "introduced a bill relating to maternity leave... propos[ing] to extend maternity leave beyond state employees and encompass all employees, public and private"); Parental and Medical Leave Act of 1986: Hearings on H.R. 4300 Before the Subcomm. On Labor Management Standards, 99th Cong., 30, 147 (testimony of Meryl Fran, Director of the Yale Bush Center Infant Care Leave Project, deploring the fact that "American women have no statutory right to parental leave" and making reference to a study she conducted researching the availability of parental leave to women only).

In light of the foregoing analysis, the district court's denial of LDSS's motion to dismiss must be reversed and the case remanded with instructions that both the official and the individual capacity claims against the named defendants be dismissed for lack of jurisdiction.[65]

REVERSED AND REMANDED, with instructions.

---

[65] The claims brought against the defendants in their individual capacities must be dismissed for lack of subject matter jurisdiction because it is clear that the State of Louisiana is the real party in interest. See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 101 (1984) ("The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest. ... [T]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter.") (citations omitted).

DENNIS, Circuit Judge, dissenting.

The majority holds, incorrectly in my opinion, that the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq., ("FMLA") is not "appropriate legislation" by which Congress has power to enforce the equal protection of the laws provision of the Fourteenth Amendment and that, therefore, the FMLA does not validly abrogate the Eleventh Amendment immunity barring suits by private citizens against the states in federal courts. My colleagues have been led into error by what I believe to be their misunderstanding of <u>Kimel v. Florida Board of Regents</u>, 120 S.Ct. 631 (2000), <u>City of Boerne v. Flores</u>, 521 U.S. 507 (1997), the prior Fourteenth Amendment jurisprudence, and the legislative record of the FMLA. For these reasons, I respectfully dissent.

I.

It is common ground in this litigation that Congress in the FMLA unequivocally expressed its intent to abrogate state immunities. <u>See</u> 29 U.S.C. §§ 2611(4)(a)(iii); 2617(a). However, the majority holds that Congress did not enact the FMLA pursuant to a valid exercise of power under the Fourteenth Amendment. The majority bases its decision primarily on the Supreme Court's recent holding in <u>Kimel</u>. <u>Kimel</u> was decided subsequently to oral argument in the present case, and the parties have not been afforded an opportunity to brief us on <u>Kimel</u>'s meaning or effect. In the absence of adversarial input, the majority looks at <u>Boerne</u> and all

of the prior jurisprudence through the wrong end of <u>Kimel</u>'s perspective glass.

The majority reads <u>Kimel</u> as standing for two propositions that would drastically reduce Congress' enforcement power under section 5 of the Fourteenth Amendment.[66]  First, the majority views the phrase "congruence and proportionality," used in <u>Kimel</u> and <u>Boerne</u> to describe appropriate § 5 legislation, as placing new, stricter limits on Congress' exercise of its Fourteenth Amendment enforcement power.  Second, the majority reads the "congruent and proportional" phrase  as supplanting the "rational means" standard for measuring Congressional power announced by Chief Justice Marshall in <u>McCulloch v. Maryland</u>, 17 U.S. (4 Wheat.) 316, 421 (1819), and applied to legislation enacted under section 5 of the Fourteenth Amendment by the Supreme Court in  <u>Ex Parte Virginia</u>, 100 U.S. (10 Otto) 339 (1879) and <u>Katzenbach v. Morgan</u>, 384 U.S. 641 (1966).  Accordingly, the majority would apply its version of the "congruent and proportional" requirement exclusively and across the board, even to § 5 legislation designed to remedy or deter governmental discrimination based on race, gender, or other suspect

---

[66]As I understand the majority opinion, it views <u>Kimel</u> and <u>City of Boerne</u> as a departure of revolutionary proportions from the Court's precedents and doctrine of stare decisis: Congress can no longer enact any legislation to deter equal protection violations of any kind without a legislative record evincing a significant pattern of unconstitutional state discrimination, and preventive legislation designed to deter state discrimination against suspect or quasi-suspect classes is not appropriate if that legislation prohibits substantially more constitutional than unconstitutional state employment decisions or actions.

or quasi-suspect classification.

The majority, in my opinion, is mistaken on both points. First, neither <u>Kimel</u> nor <u>Boerne</u> held that Congress must establish an evidentiary predicate for legislation that constitutes a rational means of deterring and preventing governmental discrimination against persons on the bases of race or gender. The Supreme Court has never suggested that Congress cannot rely on the Supreme Court's recognition of such suspect or quasi-suspect classes in enacting legislation to deter violations of their constitutional rights. Because Congress' express power to legislatively enforce the Equal Protection Clause of the Fourteenth Amendment is concurrent with the Court's judicial power to enforce the Amendment, Congress is not required to establish an evidentiary predicate independent of the Court's decisions identifying suspect classes in order to enact legislation pursuant to § 5 to protect individuals from the denial of the equal protection of the laws based on race, gender or other suspect classifications.

Second, the Supreme Court in <u>Kimel</u> and <u>Boerne</u> reaffirmed and did not limit or replace the <u>McCulloch</u> "rational means" standard as adopted by <u>Ex Parte Virginia</u>, <u>Katzenbach v. Morgan</u>, and their progeny.[67]   Thus, "congruence and proportionality" includes or is

---

[67]The majority's conflation of the "rational means" standard for appropriate Congressional legislation under §5 of the Fourteenth Amendment with the "rational basis" equal protection scrutiny level is unfortunate and tends to obstruct coherent dialogue. <u>See</u> Maj. Op., at 19-21. The majority confuses the similar-sounding terms, "rational means" and "rational basis,"– terms which in fact denote strategically different constitutional

consistent with the meaning of "rational means" or "necessary and proper" as defined by McCulloch, Ex Parte Virginia, Morgan, and their progeny; or signifies the difference between legislation and constitutional interpretation, as suggested by Boerne; or recognizes the correlation between the ranges of judicial and legislative powers to enforce the Equal Protection Clause on behalf of suspect, quasi-suspect and non-suspect classes, as suggested by Kimel; or all of the above. Assuming arguendo, however, that Kimel or Boerne purports to place any new limits on Congress' legislative power, the majority errs in applying those limits to the present case because the Court in Kimel made it very clear that its holding does not apply to § 5 legislation designed to remedy or deter governmental discrimination based on race or gender.

Undoubtedly, Congress is empowered by section 5 of the Fourteenth Amendment to enact legislation prohibiting constitutional state action if such a law is a rational means of preventing or deterring unconstitutional governmental gender discrimination. In the present case, the State has not attempted to show that any particular governmental gender classification is constitutional because it serves an important government objective.

---

analyses. "Rational means" has been used to describe Congressional legislation under §5 of the Fourteenth Amendment that appropriately remedies or deters states' violations of §1 of the Amendment. See Katzenach v. Morgan, 384 U.S. 641, 650-651 (1966)("[T]he McCulloch v. Maryland standard is the measure of what constitutes 'appropriate legislation' under § 5 of the Fourteenth Amendment.") The rational basis test is used to determine whether state discrimination against a non-suspect class is constitutionally infirm. See Kimel, 120 S.Ct. 631, 646 (2000).

31

Consequently, the only question in the present case is whether the FMLA, by prohibiting and requiring certain constitutional state employment practices, is a rational means of preventing and deterring unconstitutional governmental gender discrimination and is therefore appropriate section 5 legislation. I believe that it is self-evident that the FMLA is a rational means of deterring gender-based discrimination and that the Constitution does not require that Congress buttress its enactment with any particular kind of legislative record. In the alternative, however, if common knowledge and the statute itself are deemed to provide insufficient illumination, the legislative history and legislative records of the FMLA and other legislative activity from which it stems abundantly demonstrate that it is a rational means to an appropriate Congressional end.

II.

A.

As I read the Supreme Court's opinions in Kimel and Boerne, they do not drastically alter or restrict Congress's authority under section 5 of the Fourteenth Amendment to enforce the equal protection of the laws provision of section 1 of the amendment as the majority contends. The majority, in effect, concludes that Kimel imposes a kind of dual probability-of-success and substantial-evidence test for determining whether an act of Congress passes muster as appropriate § 5 legislation. The

majority states that: "A two part test [for determining whether legislation is 'congruent and proportional'] emerges from Kimel[:]" [1]" At the first step, we...determin[e] what type of constitutional violation the statute under review is designed to prevent." [2] "[T]he legislation will not be considered congruent and proportional[,]" and therefore, not appropriate, if: [a] "[the] legislation prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection standard," or [b] "Congress fails to include in the legislative record of a prophylactic statute any evidence of a significant pattern of unconstitutional discrimination by the States[.]" Maj.Op., at 5-7 (internal quotation marks, brackets and footnotes omitted). I do not believe that the majority's two part probability-of-success and substantial-evidence test "emerges from" or reasonably can be drawn from Kimel.

Kimel affirms that "Congress' § 5 power is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth amendment. Rather Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." Kimel, 120 S.Ct. at 644 (citing Boerne, 521 U.S. at 518) (quoting Fitzpatrick v. Bitzer 427 U.S. 455 (1976)); see also Laurence H. Tribe, American

Constitutional Law § 5-16, at 949 (3d. Ed. 1999). It is true that the Boerne Court stated that Congress does not have "the power to decree the substance of the Fourteenth Amendment's restrictions on the States" and that"[t]he power to interpret the Constitution in a case or controversy remains in the Judiciary." Boerne 521 U.S. at 519, 524. Nevertheless, the Court also made clear that under section 5 Congress has broad freedom of choice or action in determining the boundary between making a substantive change in the constitution and an act of enforcement legislation, whether remedial or deterrent. Id. at 518-19 (citing South Carolina v. Katzenbach, 383 U.S. 301, 326 (1966)).

Militating against the majority's notion of imposing a kind of probability-of-success/substantial-evidence test upon Congress, Kimel endorses Boerne's reaffirmation of Congressional autonomy: "As a general matter, it is for Congress to determine the method by which it will reach a decision" as to the risk of Fourteenth Amendment violations and the means by which particular evils should be prevented or remedied. Boerne, 521 U.S. at 531-32; see also Kimel, 120 S.Ct. at 644. The Court did not in either case lay down any probability of success ratio, procedural method, evidentiary rule or burden of proof standard for Congress to follow in performing its separate and independent legislative function. The Court did not presume to treat Congress as an inferior court or administrative tribunal; to the contrary, Boerne and Kimel merely illustrate that when Congress' purpose is ambiguous, as it is apt

to be in section 5 legislation concerned with governmental discrimination against non-suspect classes or with generally applicable state laws imposing merely incidental burdens on religion, the Court will examine the legislative history and record to determine Congress' objective, just as it does when the meaning of any Congressional act is vague or ambiguous. Thus, Kimel's commentary on the ADEA legislative record and history is directed toward judicial review of section 5 legislation aimed at non-suspect class discrimination, and is not intended as an improper judicially imposed blanket stricture upon Congress' legislative process itself:

> That the ADEA prohibits very little conduct likely to be held unconstitutional, while significant, does not alone provide the answer to our § 5 inquiry. Difficult and intractable problems often require powerful remedies, and we have never held that § 5 precludes Congress from enacting reasonably prophylactic legislation. Our task is to determine whether the ADEA is in fact just such an appropriate remedy [to a state act of non-suspect discrimination so irrational as to be unconstitutional even under a rational basis review] or, instead, merely an attempt to substantively redefine the States' legal obligations with respect to age discrimination. One means by which we have made such a determination is by examining the legislative record containing the reasons for Congress' action.

120 S.Ct. at 648. Indeed, Kimel reiterates "that lack of support is not determinative of the § 5 inquiry." Id. (citing Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank, 119 S.Ct. 2199, 2209-2210 (1999) ("lack of support in the legislative record is not determinative."); Boerne, 521 U.S. at 531-532 ("lack of support in the legislative record...is not RFRA's most serious

shortcoming. Judicial deference, in most cases, is based not on the state of the legislative record Congress compiles but 'on due regard for the decision of the body constitutionally appointed to decide.'") (quoting Oregon v. Mitchell, 400 U.S. 112, 207 (1970) (Harlan, J.)); Boerne also reiterates that it did not intend "to say, of course, that § 5 legislation requires...egregious predicates." Id. at 533; see also Lopez v. Monterey County, 525 U.S. 266 (1999)(no examination of legislative record by 8-1 majority upholding a deterrent provision of the Voting Rights Act as appropriate legislation under § 2 of the Fifteenth Amendment); id. at 295 (Thomas, J. dissenting).

The majority clearly misreads Kimel as mandating that Congress use a judicially prescribed evidence and fact gathering methodology or compile a judicially prescribed evidentiary predicate in enacting any and every measure of section 5 legislation. Rather than limit Congress' discretion, however, Kimel reaffirms that "§ 5 is an affirmative grant of power to Congress" and that "'[i]t is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference.'" Kimel, 120 S.Ct. 644. Thus, nothing in Kimel restricts Congress' freedom to choose whether to take evidence, conduct hearings, seek experts' opinions, or to rely on history, experience with previous legislation, notice of legislative facts, common knowledge, common sense, or a combination of such factors. The Court has not and

cannot legitimately impose any set form of judicially made procedures, standards, or quantum of evidence requirements upon Congress. Congress is a unique institution, separate and independent from the judicial branch and is not required by the constitution to operate like courts or follow the rules governing adversarial litigation.

From the text of Kimel itself and from the context and underpinnings of its analysis, it is evident that the majority is mistaken in concluding that Kimel narrowed the scope of Congress' section 5 legislative enforcement powers or established a new blanket requirement of adequate legislative records for all section 5 enforcement legislation. Rather, in my opinion, Kimel does not attempt to make any new law but instead represents a straightforward application of the well-settled principles established by the Court's prior jurisprudence.[68]

---

[68] Accordingly, I disagree with the majority's suggestion that Kimel calls into question this circuit's recognition of the abrogation of Eleventh Amendment immunity by the ADA under section 5 of the Fourteenth Amendment in Coolbaugh v. State of Louisiana, 136 F.3d 430 (5th Cir. 1998). Compared to the FMLA, the ADA presented a more debatable abrogation question, as it is designed to remedy and deter discrimination on the basis of disability or handicap, rather than race or gender. However, Coolbaugh is binding on the present panel, regardless of the majority's predilections. See Neinast v. Texas, ___ F.3d ___, 2000 WL 827920 (5th Cir. 2000) (post-Kimel case recognizing Coolbaugh as binding). Moreover, reasonable jurists in other circuits do not read Kimel as auguring Coolbaugh's demise. See Kilcullen v. New York State Dept. of Labor, 205 F.3d 77 (2nd Cir. 2000) (post-Kimel case finding the ADA properly enacted under section 5); Erickson v. Board of Governors of State Colleges and Universities for Northeastern Illinois University, 207 F.3d 945, 953 (7th Cir. 2000) (Wood, J., dissenting). Consequently, it would be more appropriate for the majority to consider how Coolbaugh might be reconciled with Kimel,

B.

Besides misconstruing <u>Kimel</u> and <u>Boerne</u> as placing new limits, stricter than the "rational means" standard, on Congress' Fourteenth Amendment enforcement powers, the majority overlooks the significant difference noted by these cases between a Congressional act designed to deter governmental equal protection violations against suspect or quasi-suspect classes and other types of preventive legislation purportedly enacted pursuant to the enforcement sections of the Reconstruction Amendments. <u>Kimel</u> explicitly distinguished governmental discrimination on the basis of age from state action based on race, gender, or other suspect classifications:

> Age classifications, unlike governmental conduct based on race or gender, cannot be characterized as 'so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy.' <u>Cleburne v. Cleburne Living Center, Inc.</u>, 473 U.S. 432, 440 (1985). Older persons, again, unlike those who suffer discrimination on the basis of race or gender, have not been subjected to a 'history of purposeful unequal treatment.' <u>Murgia</u>, supra, at 313, (quoting <u>San Antonio Independent School Dist. v. Rodriquez</u>, 411 U.S. 1, 28 (1973)). Old age also does not define a discrete and insular minority because all persons, if they live out their normal life spans, will experience it. Accordingly, as we recognized in <u>Murgia</u>, <u>Bradley</u>, and <u>Gregory</u>, age is not a suspect classification under the Equal Protection Clause. <u>See, e.g.</u>, <u>Gregory</u>, supra, at 470; <u>Bradley</u>, supra, at 97; <u>Murgia</u>, supra, at 313-314.
> States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest. The rationality commanded by the Equal Protection Clause does not require States to match age distinctions and the legitimate interests they

---

rather than abandon <u>Coolbaugh</u> prematurely.

serve with razorlike precision. As we have explained, when conducting rational basis review 'we will not overturn such [government action] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational.' Bradley, supra, at 97. In contrast, when a State discriminates on the basis of race or gender, we require a tighter fit between the discriminatory means and the legitimate ends they serve. See, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995) ('[Racial] classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests'); Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982) (holding that gender classifications are constitutional only if they serve 'important governmental objectives and ... the discriminatory means employed' are 'substantially related to the achievement of those objectives' (citation omitted)).

120 S.Ct. at 645-646 (citations partially omitted).

In other words, Kimel can be read to admonish that: Unlike age or other classifications subject to rational basis review, governmental conduct based on race or gender is deemed to reflect prejudice and antipathy because it is so seldom relevant to the achievement of any legitimate state interest. Persons who suffer discrimination on the basis of race or gender have been subjected to a history of purposeful unequal treatment. A suspect class defines a discrete and insular minority. Race and gender are suspect classes under the Equal Protection Clause. See id. Racial classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests. Gender classifications are constitutional only if they serve important governmental objectives and the discriminatory means are substantially related to the achievement of those objectives. See

id. at 646.

Moreover, Kimel demonstrates that the history of States' unequal treatment of persons based on race or gender clearly justifies the strongest exercise of powers by the Court and the Congress to enforce the Fourteenth Amendment equal protection guarantee. Accordingly, there is an important corollary between the Court's strict scrutiny of state action based on suspect classifications and Congress' vast power to adopt strong measures to remedy and deter governmental discrimination against persons based on race or gender.

In San Antonio Independent School Dist.v. Rodriquez, 411 U.S. 1, 28 (1973), a case cited as instructive by Kimel, the Court identified a suspect class as one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process."   The Court in Kimel indicated that age, unlike race or gender, is not a suspect classification warranting either judicial strict scrutiny or section 5 legislation that presumes governmental action based on every age classification to be unconstitutional. For example, the Court in Kimel stated: "Older persons...unlike those who suffer discrimination on the basis of race or gender, have not been subjected to a "history of purposeful unequal treatment." 120 S.Ct., at 645.  "The [ADEA], through its broad restriction on the use of age as a discriminating factor, prohibits

substantially more state employment decisions than would likely be held unconstitutional under the applicable equal protection, rational basis standard." Id. at 647. "Measured against the rational basis standard of our equal protection jurisprudence, the ADEA plainly imposes substantially higher burdens on state employers[, imposing] substantive requirements...at a level akin to our heightened scrutiny cases under the Equal Protection Clause." Id. at 648. "[Thus,] the ADEA's protection extends beyond the requirements of the Equal Protection Clause." Id. "Congress, through the ADEA, has effectively elevated the standard for analyzing age discrimination to heightened scrutiny." Id.

In contrast, governmental action based on race or gender classifications is presumed to be unconstitutional, warrants heightened or strict judicial scrutiny, and places the burden of justification entirely on the state. With respect to sex discrimination, the Supreme Court in United States v. Virginia, 518 U.S. 515, 531 (1996)(VMI Case) held: "Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." (citing J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 136-137, n. 6 (1994); Mississippi Univ. for Women, 458 U.S. at 724). Furthermore, the Court in the VMI case noted that: "Without equating gender classifications, for all purposes, to classifications based on race or national origin, the Court, in post-Reed decisions, has carefully inspected official action that closes a door or denies

opportunity to women (or to men)." Id. at 532 (citing J.E.B., 511 U.S. at 152 (Kennedy, J., concurring) (case law evolving since 1971 "reveal[s] a strong presumption that gender classifications are invalid")). "To summarize the Court's current directions for cases of official classification based on gender[,]" the Court in the VMI case stated: "Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is exceedingly persuasive. The burden of justification is demanding and it rests entirely on the State. The State must show at least that the challenged classification serves important governmental objectives." Id. at 532-533 (internal quotations, citations and brackets omitted).

As Kimel suggests, when the Supreme Court identifies a government classification of persons as suspect or quasi-suspect, it effectively broadens the scope of Congressional power to remedy or deter governmental discrimination based on that classification. See Kimel, 120 S.Ct. at 646. Congress may rely on the presumption that state action based on the suspect classification is unconstitutional in enacting legislation that outlaws constitutional conduct as a rational means of deterring such presumptively unconstitutional governmental conduct.[69] Thus,

---

[69] Governmental gender classifications are presumptively invalid. E.g., United States v. Virginia, 518 U.S. at 532 (citing J.E.B. v. Alabama ex rel. T.B., 511 U.S 127, 152 (Kennedy, J. concurring)). Section 5 legislation outlawing constitutional conduct to prevent or deter violations of suspect or quasi-suspect

Congress is not required to compile an evidentiary legislative record to prove that a suspect class previously identified by the Supreme Court is still "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." Rodriquez 411 U.S. at 28. That the class in question is marked sufficiently by the traditional indicia that identify a suspect class has already been established by the Supreme Court's decision.

In fact, Kimel's recognition of the parallel or kinship

---

classes' rights has consistently been upheld. See, e.g., Fitzpatrick v. Bitzer, 427 U.S. 445, 453, n.9 (1976)(federal court action under Title VII by present and retired male employees of Connecticut against the state, based on governmental gender discrimination in state retirement plan, was not precluded by the Eleventh Amendment. It was undisputed that Congress enacted Title VII, which grants remedial and deterrent protection to suspect and quasi-suspect classes, and its 1972 Amendments extending coverage to the States as employers, pursuant to its power under § 5 of the Fourteenth Amendment.); Katzenbach v. Morgan, 384 U.S. 641, 652 (1966)(upholding § 4(e) of the Voting Rights Act of 1965 as appropriate legislation under § 5 of the Fourteenth Amendment "to secure for the Puerto Rican community residing in New York nondiscriminatory treatment by government–both in the imposition of voting qualifications and the provision or administration of governmental services, such as public schools, public housing and law enforcement."); Lopez v. Monterey County, 525 U.S. 266 (1999)(Hispanic voters successfully challenged unprecleared ordinance changing methods for electing county judges enacted by Monterey County, which was designated a jurisdiction covered by the preclearance requirement, § 5 of Voting Rights Act of 1965, although the election change was required by state law, California itself was not a covered jurisdiction, and, according to Justice Thomas' dissent, id., at 295-296, there had "been no legislative finding that the State of California has ever intentionally discriminated on the basis of race, color, or ethnicity with respect to voting.")

between the powers and duties of the Court and those of the Congress to enforce the equal protection clause against governmental discrimination on the basis of race or gender with heightened stringency was anticipated by at least three Circuit Courts of Appeals in interpreting Boerne. See Mills v. Maine, 118 F.3d 37 (1st Cir. 1997); Abril v. Commonwealth of Virginia, 145 F.3d 182 (4th Cir. 1998); Velasquez v. Frapwell, 160 F.3d 389, 391 (7th Cir. 1998) vacated in part 165 F.3d 593 (7th Cir. 1999).

The Kimel Court recognized that even governmental discrimination based on classifications subject only to rational basis judicial review can present "[d]ifficult and intractable problems ...requir[ing] powerful remedies" that allow Congress under § 5 to enact "reasonably prophylactic legislation." Kimel, 120 S.Ct. at 648. Further, such legislation will upheld when the Court can determine that the act "is in fact just such an appropriate remedy" by, for example, "examining the legislative record containing the reasons for Congress' action." Id. Thus, the Court in Kimel did not impose a blanket evidentiary or proof requirement upon Congress' section 5 powers; instead, the Court examined the ADEA's legislative record in Kimel only to determine whether that act, which did not address state discrimination on the basis of a suspect classification, was in fact an appropriate remedy for a state act of discrimination against a non-suspect class that was so irrational as to be a denial of equal protection under the rational basis standard of review.

Accordingly, I believe that the majority misreads _Kimel_ as defining a blanket test for all section 5 legislation. The holding in _Kimel_ clearly was not intended to apply to statutes which prohibit constitutional behavior as a rational means to deter unconstitutional discrimination against a suspect or quasi-suspect class.

                                    III.

To determine whether the FMLA is appropriate section 5 legislation, the majority errs by relying upon a superficial reading of the latest several cases, which as discussed _supra_ did not alter the section 5 analysis in the present case, rather than properly examining the statute within the larger framework of the entire body of jurisprudence regarding constitutional grants of both legislative and judicial powers to enforce the equal protection of laws provisions of the Fourteenth and Fifteenth Amendments against governmental action based on suspect classifications.

Section 5 of the Fourteenth Amendment is a congressional enforcement clause virtually identical to those found in the Thirteenth, Fifteenth, Eighteenth, Nineteenth, Twenty-third, Twenty-fourth, and Twenty-sixth Amendments. To determine if Congress is acting pursuant to its enforcement clause powers, we look to whether the act is a rational means to an end that is comprehended by the underlying constitutional amendment. _See,_

e.g., South Carolina v. Katzenbach, 383 U.S. at 324, 326 (upholding Voting Rights Act of 1965 under the Fifteenth Amendment's enforcement clause); James Everard's Breweries v. Day, 265 U.S. 545, 558-59, 563 (1924) (upholding Supplemental Prohibition Act of 1921 under the Eighteenth Amendment's enforcement clause); Mills, 118 F.3d at 44; Velasquez, 160 F.3d at 391.[70]

In Ex Parte Virginia, 100 U.S.(10 Otto) 339(1879), the Supreme Court interpreted Congress' power to enact "appropriate legislation" under the Civil War Amendments broadly, in line with McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421 (1819), concluding that "[w]hatever legislation is...adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against state denial or invasion, if not prohibited, is brought within the domain of congressional power." Id. at 345-346.

In Katzenbach v. Morgan, 384 U.S. 641 (1966), the Supreme Court held that § 5 of the Fourteenth Amendment "is a positive grant of legislative power authorizing Congress to exercise its

_____

[70]See also Laurence H. Tribe, American Constitutional Law, § 5-17, at 959-960 (3rd ed. 1999) [hereinafter Tribe]: "Katzenbach v. Morgan and all its progeny spanning nearly 34 years by the turn of the century, have now settled beyond question that, in order to enforce § 1 of the Fourteenth Amendment, Congress may, acting pursuant to §5, outlaw practices that are not themselves violations of § 1 in any sense — provided one can show that outlawing those practices is a rational way to deter or to remedy actions that would violate § 1." (Footnote and emphasis omitted).

discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." Id. at 651. In particular, the Court determined that a Congressional enactment is "appropriate legislation" under section 5 for Equal Protection purposes if: [1] "under the McCulloch v. Maryland standard, [it] may be regarded as an enactment to enforce the Equal Protection Clause, [2] it is plainly adapted to that end and [3] it is not prohibited by but is consistent with the letter and spirit of the constitution." Id. at 651 (footnote and internal quotations omitted).

Consequently, under McCulloch, Ex parte Virginia, Katzenbach v. Morgan and their progeny Congress may, when acting pursuant to §5 to enforce §1 of the Fourteenth Amendment, "outlaw practices that are not themselves violations of § 1 in any sense—provided one can show that outlawing those practices is a rational way to deter or to remedy actions that would violate § 1." See Tribe, *supra* n.3. As noted above, rather than being limited, the well settled principle that Congress has the power to prohibit conduct which is not itself unconstitutional as a rational means of preventing or deterring violations of the Fourteenth Amendment was recognized and reaffirmed by both Kimel and Boerne. See also Lopez, 525 U.S. at 282 (post-Boerne case reaffirming the well established principles that (1) "the Reconstruction Amendments by their nature contemplate some intrusion into areas traditionally reserved to the States" and that (2) "legislation which deters or remedies constitutional

violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy previously reserved to the states").

A number of distinguished jurists applying the Katzenbach v. Morgan test, as interpreted by Fitzpatrick, have expressly or implicitly adopted the view that section 5 legislation designed to remedy, deter or prevent denial of equal protection of the laws to a suspect or quasi-suspect class will be deemed appropriate if the Court can see that it is a rational means of furthering that purpose, as the risk that any differentiation on such basis would be unconstitutional is significant. See, e.g., Mills, 118 F.3d at 44; Abril, 145 F.3d at 187, n.11; Velasquez, 160 F.3d at 391; Corpus v. Estelle, 605 F.2d 175, 180 (Wisdom, J.). This idea is clearly implied by, or reasonably inferred from, the Court's opinion in Kimel.

The theory is bolstered by the Court's approval of several important civil rights measures designed to prevent or deter unconstitutional government discrimination based on race or sex by outlawing constitutional government actions. See,e.g., Fitzpatrick, 427 U.S. at 456 (affirming that Title VII abrogated the States' Eleventh Amendment immunity with regards to sex discrimination including disparate effects inequality in employment); South Carolina v. Katzenbach, 383 U.S. at 324 (upholding under the Fifteenth Amendment, certain enforcement provisions of the Voting

Rights Act of 1965 designed to both remedy and deter governmental race discrimination in voting); Katzenbach v. Morgan, 384 U.S. at 652(upholding the Voting Rights Act provision that banned otherwise valid English language requirement for voting as appropriate legislation enforcing the Equal Protection Clause of the Fourteenth Amendment); Lopez, 525 U.S. at 282 (upholding the Voting Rights Act's application of pre-clearance requirements against partially covered state governments as appropriate legislation deterring violations of the Fifteenth Amendment by county governments at the direction of the state).

Accordingly, unlike the majority, I do not believe that the Constitution or the Supreme Court's decisions require Congress to cite specific evidence of actual constitutional violations when the evil it seeks to remedy, deter or prevent is governmental discrimination against persons based on race, gender or other characteristics that the Supreme Court has recognized as marking a group as a suspect class. In the judicial enforcement of the Equal Protection Clause, a valid claim of governmental discrimination against a suspect class calls for a shifting of the burden of production and persuasion to the State to prove that the legislation "must serve a compelling government interest, and must be narrowly tailored to further that interest." See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 235 (1995). If the quasi-suspect classification of gender is involved, the "burden of justification is demanding and it rests entirely on the state . .

. [to] show at least that the challenged classification serves important governmental objectives." VMI Case, supra, at 532-533.

Consequently, when Congress is exercising its concurrent power and duty to enforce the Equal Protection Clause of the Fourteenth Amendment on behalf of a group which has been identified as a suspect or quasi-suspect class by the Supreme Court, Congress is not required to prove past or potential governmental discrimination against that class before proceeding to enact rational means of remedying, preventing or deterring the risk of future violations of the constitutional rights of members of that suspect class. As discussed supra, by definition, a suspect class is one which the Supreme Court has determined to have been subjected to both current and historical discriminatory treatment. See, e.g., Plyler v. Doe, 457 U.S. 202, 216 n.14 (1982); Rodriquez, 411 U.S. at 28; see also Mark Strasser, Suspect Classes and Suspect Classifications: On Discriminating, Unwittingly or Otherwise, 64 Temp.L.Rev. 937 (1991).

Thus, it is possible for a court to determine that Congress was acting pursuant to section 5 of the Fourteenth Amendment to prevent or deter violations of §1 of the Amendment without Congress having identified any specific evidence of race or gender discrimination by the States, if a court can ascertain that the measure is a rational means adopted to deter or prevent discrimination against suspect classes. While evidence of specific past constitutional violations against members of a suspect class

may well help a court to see that deterrent legislative means are rational, it is not always necessary that Congress have developed such evidence. See, e.g., Lopez, 525 U.S. at 282; Kilcullen v. New York State Dept. of Labor, 205 F.3d 77, 80 n.6 (2nd Cir. 2000) (post-Kimel case holding "that courts may look beyond the information in the legislative record in assessing whether a statute is a valid exercise of Congress's § 5 powers."); Hundertmark v. State of Florida D1ept. of Transportation, 205 F.3d 1272, 1276 (11th Cir. 2000) (post-Kimel case holding that under the Equal Pay Act, "[w]hile it is true that Congress has not made similar findings with respect to wage discrimination in the public sector, such findings are not fatal...").  This is consistent with the Supreme Court's continuous support of Congress' ability to enact broad prophylactic legislation to prevent race or gender discrimination. See Kimel, 120 S.Ct. at 648; see also Mills, 118 F.3d at 47.[71]

For example, the Court and this circuit have held, without requiring specific proof of pervasive constitutional violations, that Congress may, under section 5, deter unconstitutional

---

[71]This is also consistent with the fact that the Supreme Court has never held that a statute intended to remedy race or sex discrimination was not enacted pursuant to section 5 of the Fourteenth Amendment. Compare Kimel, 120 S.Ct. at 649; Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank, 527 U.S. 627 (1999) (holding the Patent Remedy Act not enacted pursuant to section 5); Boerne, 521 U.S. at 531 (holding the Religious Freedom Restoration Act not enacted pursuant to section 5) with Fitzpatrick v. Bitzer, 427 U.S. 445 (1976) (holding Title VII of the Civil Rights Act was enacted pursuant to section 5).

discrimination against suspect classes by outlawing constitutional, non-intentional discrimination against suspect classes in the workplace,[72] banning constitutional literacy tests,[73] banning constitutional English language requirements for students educated only in Spanish in American schools,[74] imposing a non-constitutionally mandated requirement of pre-clearance for changes

---

[72]See Fitzpatrick, 427 U.S. at 456. Although the Constitution does not prohibit non-intentional acts that disparately impact suspect classes, Washington v. Davis, 426 U.S. 229 (1976), Title VII does. Thus, the Supreme Court has already once found that Congress is acting pursuant to section 5 when outlawing broad swaths of conduct that are not unconstitutional as a means to deter unconstitutional discrimination on the basis of race or sex. See Cole, 1997 Sup.Ct.Rev. at 45. This circuit has recently reaffirmed this holding. See Ussery v. Louisiana, 150 F.3d 431, 434 (5th Cir. 1998).

[73]See Oregon v. Mitchell, 400 U.S. 112 (1970); South Carolina v. Katzenbach, 383 U.S. at 336. The Court in Boerne specifically cited passages from South Carolina v. Katzenbach that support Congress' ability to enact legislation based on Congress' rational belief that such legislation would deter discrimination without specific proof that such discrimination had occurred. Boerne, 521 U.S. at 526 ("Congress could have determined that racial prejudice is prevalent throughout the Nation, and that literacy tests unduly lend themselves to discriminatory application, either conscious or unconscious") (opinion of Harlan, J.); ("[T]here is no question but that Congress could legitimately have concluded that the use of literacy tests anywhere within the United States has the inevitable effect of denying the vote to members of racial minorities whose inability to pass such tests is the direct consequence of previous governmental discrimination in education") (opinion of Brennan, J.); ("[N]ationwide [suspension of literacy tests] may be reasonably thought appropriate when Congress acts against an evil such as racial discrimination which in varying degrees manifests itself in every part of the country") (opinion of Stewart, J.) (internal citations omitted).

[74]Katzenbach v. Morgan, 384 U.S. at 651.

in voting standards,[75] and granting non-constitutionally mandated attorney's fees to parties bringing victorious claims under the Civil Rights Act.[76]  Thus, in this respect I agree with Judge Posner, who stated in interpreting this power that Congress can believe those who "constitute a historically disadvantaged ('suspect') class . . . might be thought in need of special protections -- of a glacis in front of the core [constitutional] prohibitions -- in order to make those prohibitions fully effective."  Velasquez, 160 F.3d at 391.

Turning to an analysis of the FMLA in light of the foregoing principles, I first emphatically disagree with the majority's piecemeal, fragmented approach to a determination of whether the statute is a congruent, proportional and rational means to prevent and deter governmental and private gender based discrimination. The FMLA is a comprehensive, reticulated statute that prohibits and requires a synergism of constitutional employment practices as a rational means of deterring the difficult and intractable evils of governmental and private gender based discrimination in employment. Although a principal goal of the FMLA is to deter sex discrimination against male and female employees in granting leave time, the statute also addresses a complex of inextricably related

---

[75]See Lopez, 525 U.S. at 282; id. at 295 (Thomas, J., dissenting) (noting that the Court did so without requiring specific proof in the legislative record); City of Rome v. United States, 446 U.S. 156 (1980).

[76]See Corpus, 605 F.2d at 180.

issues and side effects, such as, gender discrimination based on sexual stereotypes, counterbalancing of perceived inequities and incentives to discriminate, and the ramifications of the legislation for children and families. As the majority concedes, it has no authority to support its atomistic interpretative methodology by which it parses the statute into subsections, examines each in isolation, and requires that each be based on its own separate evidentiary predicate. Proceeding as the proverbial blind men examining an elephant's parts my colleagues fail to discover the true nature of the creature as a whole. As discussed infra, the remedies implemented by the FMLA are not distinct, but rather were found interdependently necessary as a whole to effectuate Congress' stated purpose to deter and prevent unconstitutional discrimination.

The FMLA undoubtedly was enacted to deter or prevent unconstitutional gender discrimination against employees by both governmental and private employers. Section 2601 of the FMLA lists the findings and purposes of the FMLA related to gender discrimination by public and private employers:

(a) Congress finds that:

                    *     *     *

          (5) due to the nature of the roles of men and
          women in our society, the primary
          responsibility for family caretaking often
          falls on women, and such responsibility
          affects the working lives of women more than
          it affects the working lives of men; and

          (6) employment standards that apply to one

gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender.

*   *   *

(b) It is the purposes of this Act

(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity;

* * *

(2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition;

* * *

(4) to accomplish the purposes described in paragraphs (1) and (2) in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis.

(5) to promote the goal of equal employment opportunity for women and men, pursuant to such clause.

29 U.S.C. § 2601(a)(5)-(6), (b)(1)-(2), (b)(4)-(5); <u>see also</u> S.Rep. No. 103-3 at 16 (1993) ("A law providing special protection to women or any defined group . . . runs the risk of causing discriminatory treatment. S.5, by addressing the needs of all workers, avoids such a risk.") and H.R.Rep. No. 103-8(I), at 29 (1993). It is thus clear that one principal purpose of the FMLA

was to act as legislation under section 5 of the Fourteenth Amendment to prevent or deter sex discrimination in the granting of family leave by both private and public employers.

Because a gender classification, as a basis for state action, is quasi-suspect under the Equal Protection Clause and calls for heightened scrutiny,[77] the sole inquiry under the Supreme Court's cases, including Kimel and Boerne, is whether the FMLA's prohibition of certain constitutional state conduct is a rational means to deter gender discrimination by government employers. By imposing a fixed amount of leave time for both men and women, Congress has insured that no employer, private or public, will be able to discriminate in granting leave time based on historical, irrational gender-based stereotypes by either refusing to hire women because of their perceived role as the primary caregiver and nurturer of families or by refusing to allow leave time to men based on the assumption that women are better suited for such roles. Thus, it clearly cannot be denied that the FMLA is a rational means of deterring governmental gender discrimination against employees. That Congress has not chosen a less intrusive means to achieve this end or that this court would have adopted a narrower means is entirely irrelevant to the sole issue at hand –

---

[77]See, e.g., United States v. Virginia, 518 U.S. at 533 (affirming the heightened constitutional scrutiny for sex discrimination); Orr v. Orr, 440 U.S. 268 (1979) (holding state alimony laws may not discriminate against men); Califano v. Goldfarb, 430 U.S. 199, 208 n.8 (1977) (holding discrimination against men must meet heightened constitutional scrutiny).

whether such a means is a rational way to deter governmental sex discrimination.[78]  As it is impossible to say, in view of our common political, social and historical knowledge, that the legislation is not a rational means of deterrence of unconstitutional gender discrimination, I believe the FMLA was properly enacted under Congress' section 5 enforcement powers and thus properly abrogates the States' Eleventh Amendment immunity.

IV.

Even if it were required that Congress compile a legislative record to demonstrate the existence of past and current gender discrimination by government employers as a predicate for the enactment of the FMLA pursuant to section 5 (although I believe there is no such constitutional requisite), the procedural and legislative history of the FMLA clearly provides more than a sufficient predicate of evidence, findings and facts.  The FMLA is the end result of a lengthy process intended,  through the imposition of employment standards, to deter sex discrimination against both men and women in the granting of leave time.  The legislative history and record bear out that, unlike the majority's reading, Congress enacted the FMLA as a single, comprehensive response to prevent sex discrimination in governmental and private

---

[78]Further, as discussed _infra_, Congress in fact did attempt to deter gender discrimination through narrower means by enacting the Pregnancy Discrimination Act, and found such means ineffective.

workplaces that Congress had unsuccessfully attempted to address through more narrowly tailored legislation for over three decades.

Initially, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., was intended to remedy discrimination in the workplace based on, inter alia, sex. In 1972, perceiving widespread discrimination on the basis of sex in educational institutions, Congress amended Title VII to extend its coverage to such institutions. See H.R. Rep. 92-238 at n.6 ("Discrimination against minorities and women in the field of education is as pervasive as discrimination in any other area of employment . . . . When they have been hired into educational institutions . . . women have been relegated to positions of lesser standing than their male counterparts."). In 1976, however, the Supreme Court held that Title VII did not protect discrimination based on pregnancy under the theory that such discrimination is not discrimination based on sex, but rather is discrimination among women based on a medical condition. See General Electric Co. v. Gilbert, 429 U.S. 125 (1976) (citing Geduldig v. Aiello, 417 U.S. 484 (1974)). In response, Congress amended section 701 of Title VII by enacting the Pregnancy Discrimination Act ("PDA"), effectively overruling Gilbert by amending the definition of discrimination on the basis of sex to include discrimination on the basis of pregnancy. Although not directly addressing Geduldig, the Court did implicitly recognize that the PDA was proper prophylactic legislation to prevent sex discrimination under Title VII and thus

reversed Gilbert in full. See Newport News, 462 U.S. at 676 (1983) (recognizing that the PDA "not only overturned the specific holding in [Gilbert] but also rejected the test of discrimination employed by the Court in that case").

The PDA, although amending the definition of discrimination to include discrimination based on pregnancy, failed to affirmatively grant pregnant workers leave time or the right to return to their job; rather, an employer only needed to provide such benefits if he provided them to other temporarily disabled workers. In response, the State of California enacted legislation mandating these rights for pregnant workers. The California statute was soon challenged in federal court on the grounds that it required employers to discriminate against non-pregnant employees in violation of Title VII as amended by the PDA. Although eventually reversed by the Ninth Circuit and the Supreme Court, the Central District of California held that the California statute did so conflict with Title VII. See California Savings and Loan Assoc. v. Guerre, 479 U.S. 272 (1987). Perceiving that enacting the PDA had not achieved the intended result of preventing discrimination against either women or men in the granting of leave time in that the States felt it necessary to affirmatively grant pregnancy leave to women and not men, in 1985 Congress began considering the issue of family and medical leave. See generally Sabra Craig, Note, The Family and Medical Leave Act of 1993: A Survey of the Act's History, Purposes, Provisions and Social Ramifications, 44 Drake L.Rev. 51 (1995).

In 1985, Representative Pat Schroeder introduced the Parental and Disability Leave Act of 1985 ("PDLA") in the House of Representatives.  The PDLA provided for eighteen weeks of unpaid leave for both mothers and fathers of newborn or adopted children and twenty-six weeks of unpaid leave for employees' non-work related disabilities or sick children.  The PDLA was not considered by the House of Representatives, but was resubmitted in 1986 by Representative William Clay and renamed the Parental and Medical Leave Act of 1986 ("PMLA").  The Subcommittee on Compensation and Employee Benefits and the Committee on Post Office and Civil Service conducted joint hearings on the PMLA, as did the Subcommittee on Labor Management Standards, to determine the extent of discrimination against men and in favor of women in the workplace with regard to taking leave to care for sick family members.  The full House of Representatives once again failed to consider the bill.  In 1989, Representative Clay re-introduced the Family and Medical Leave Act in the House of Representatives.  The 1989 version, which was substantially similar to the 1987 version, was passed by both the House of Representatives and the Senate but was vetoed by President Bush in June 1990.  In January 1991 Senator Christopher Dodd introduced the Family and Medical Leave Act of 1991 to the Senate, which was identical to the bill vetoed by the President in 1991.  Congress then amended the bill, changing solely the amount of mandatory leave per year from between eighteen to twenty-six weeks to twelve weeks.  The Act was eventually passed by

both the House of Representatives and the Senate, only to be vetoed once again in September 1992 by President Bush. See generally H.R. Rep. No. 103-8(II).

In January 1993, Representative William Ford once again introduced the Family and Medical Leave Act ("FMLA") to the House of Representatives. The leave provisions of the 1993 FMLA were substantially similar to those of the amended 1991 FMLA. H.R. Rep. No. 103-8(II) (1993). In considering enactment of the 1993 FMLA, the House of Representatives considered both new evidence of discrimination based on sex with regard to leave and reviewed the testimony given at hearings with respect to the prior "substantially similar" bills considered in prior years. H.R. Rep. No. 103-8(I). The 1993 FMLA was passed by both the House of Representatives and the Senate, and was signed into law in February 1993 by President Clinton.

As the House Report indicates, the genesis of the FMLA has its roots in the 1985 proposed legislation and is substantially similar to that legislation. Further, the House Report indicates that not only did Congress know of the previous efforts to enact the FMLA, but it based each subsequent version on prior versions. The House of Representatives makes multiple references to the committee hearings held for the 1986 PMLA and utilizes some of the findings as a basis for enacting the FMLA. H.R. Rep. No. 103-8(I). As a result of these references it is not only permissible, but necessary, to look to the legislative history and intended purposes

of these earlier bills as well as the one finally enacted into law in 1993 to determine Congressional intent.[79]

It appears clear from the legislative history that Congress perceived sex discrimination in the granting of family and medical leave, notably in favor of granting such leave to women, and was acting accordingly in enacting the FMLA. See, e.g., S.Rep. No. 103-3, at 14 – 15 (1993) (discussing studies by the Bureau of Labor Statistics highlighting the discrepancy between the availability of maternity and paternity leave). Testimony in hearings throughout the legislative process demonstrated that such discrepancies occurred in both the private and public sectors. See, e.g., Parental and Medical Leave Act of 1986: Hearings on H.R. 4300 Before the Subcomm. on Labor Management Standards, 99th Cong., 30, 147 (testimony of Meryl Frank, Director of the Yale Bush Center Infant Care Leave Project, that "[w]e found that public sector leaves don't vary very much from private sector leaves."); id. at 147 (statement of the Washington Council for Lawyers that "men, both in the public and private sectors, receive notoriously discriminatory treatment in their request for such leave."); Parental and Medical Leave Act of 1987: Hearings on S.249 Before the Subcomm. on Children, Family, Drugs and Alcoholism, 100th Cong., 364-74 (testimony of Elaine Gordon, Member of the Florida House of

---

[79]Despite their protestations, it appears that the majority agrees in that the only legislative history cited in the majority opinion is from these earlier bills, including the 1987 act. See Maj.Op. at 9.

Representatives, that leave is only granted to female [public] employees in Florida and that Florida rejected extending such leave to men); id. at 385 (testimony of Gerald McEntee, International President, American Federation of State, County and Municipal Employees that "the vast majority of our [public employment] contracts, even though we look upon them with great pride, really cover essentially maternity leave, and not paternity leave. And this is so key to the bill that it opens up the eyes of employers and opens up the eyes of America."); Family and Medical Leave Act of 1989: Hearings on H.R. 770 Before the Subcomm. on Labor-Management Relations, 101st Cong. 271 (statement of the Concerned Alliance of Responsible Employers that 13 states grant family leave to women and not men).[80]

The House Report on the 1993 FMLA indicates that Congress was aware of such testimony and at least partially relied on this testimony in enacting provisions of the current FMLA. See, e.g.,

---

[80]The majority relies heavily on the statement in Kimel that the Court would not impute evidence of age discrimination by private employers to the States. See Kimel, 120 S.Ct. at 649. This statement must be taken in the context of Kimel, i.e., that evidence of private discrimination based on age has no probative value with respect to unconstitutional discrimination based on age by the States because it is so unlikely that discrimination engaged in by private employers would be considered unconstitutional if engaged in by States. With respect to race and gender, however, because of the significant likelihood that any discrimination by States on those bases would be unconstitutional, evidence that such discrimination is widespread throughout the private sector may be sufficient in itself to justify Congressional enactment of prophylactic legislation to prevent such widespread discrimination from being performed by the States. Cf. Florida Prepaid, 527 U.S. at ___; 119 S.Ct. at 2207.

H.R.Rep. No. 103-8(I) (1993) ("Meryl Frank, director of the Infant Care Leave Project of the Yale Bush Center in Child Development and Social Policy, reported to the committee on the 1986 conclusions and recommendations of the Project's Advisory Committee on Infant Care Leave."). Further, the Senate Report specifically mentioned that the FMLA was passed in response to "government policies that have failed to adequately respond to recent economic and social changes that have intensified the tensions between work and family." S.Rep. No. 103-3 at 4 (1993). It thus seems clear that Congress intended to enact the FMLA at least in part to directly remedy actual incidents of sex discrimination in the granting of family leave time that existed in both the public and private sectors. See generally Garrett v. University of Alabama at Birmingham Board of Trustees, 193 F.3d 1214, 1228-30 (11th Cir. 1999) (Cook, J., dissenting) (providing a comprehensive discussion of the background of the FMLA). Thus, in this respect I cannot agree with the majority that "Congress identified no pattern of discrimination by the States with respect to the granting of employment leave for the purpose of providing family care," nor can I agree that "the legislative record for this provision is devoid of evidence of public sector discrimination" against the temporarily disabled, as this was precisely what the PDA and then the FMLA were enacted in response to. Maj.Op. at 10, 11.

Thus, even under the majority's reasoning, I believe there is more than a sufficient evidentiary and factual predicate in the

legislative record to support Congress's determination that the FMLA was a rational means of deterring and preventing sex discrimination by governmental employers and thus was enacted pursuant to its section 5 powers. As all parties agree that Congress provided the necessary clear statement of its intent to abrogate, the FMLA as appropriate section 5 legislation properly abrogates the States' Eleventh Amendment immunity under this rationale as well.

879